**FILED**

J.N    JAN 1 0 2007
JAN 10, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 05 CR 727 |
| | ) | |
| v. | ) | Violations: Title 18, |
| | ) | United States Code, Sections |
| CONRAD M. BLACK, | ) | 1341, 1343, 1346, 1512, 1957, 1962 and 2; |
| JOHN A. BOULTBEE, | ) | Title 26, United States Code, Section 7206(2) |
| PETER Y. ATKINSON and | ) | |
| MARK S. KIPNIS | ) | Hon. Amy J. St. Eve |
| | ) | |

**SUPERSEDING INFORMATION**

**COUNT ONE**

The UNITED STATES ATTORNEY charges:

1. At times material herein:

**The Entities and Individuals**

a.    Hollinger International, Inc. ("International") was a Delaware corporation with an office located in Chicago, Illinois. International was a holding company that was publicly traded on the New York Stock Exchange. Through its operating subsidiaries, International owned and published newspapers around the world, including the *Chicago Sun-Times*, *The Daily Telegraph* in the United Kingdom, the *National Post* in Toronto, the *Jerusalem Post* in Israel, and numerous community newspapers in the United States and Canada. International had a Board of Directors and an Audit Committee that met regularly to conduct business. The Audit Committee, which consisted of three independent directors, functioned as International's independent director committee for purposes of reviewing and approving the fairness of transactions between International and its controlling shareholders, officers and/or directors · commonly referred to as "related party transactions."

b.    Delaware corporate law imposes a fiduciary duty of loyalty on controlling shareholders, officers and directors of Delaware corporations such as International that forbids them from using their position of trust and confidence to further their private interests. Furthermore, this

fiduciary duty forbids controlling shareholders, officers and directors from usurping corporate opportunities for their own personal benefit, or misleading or deceiving the corporation's board of directors. Controlling shareholders, officers and directors seeking to engage in related party transactions with a company under their control must disclose all material facts to the independent directors of the company and abide by the determination of those directors as to the fairness of the transaction. Such fiduciaries must ensure that all such related party transactions are "entirely fair," meaning that the transaction was both procedurally and substantively fair to the company.

      c.     Hollinger Inc. ("Inc.") was a Canadian corporation with its principal office located in Toronto, Canada. Inc. was a holding company that was publicly traded on the Toronto Stock Exchange. Inc.'s primary asset was its interest in International, which it held directly and through various subsidiaries. Throughout the relevant time period, Inc. held approximately 30% of International's equity, but still controlled a majority of International's stock voting power. This disproportionate voting power existed because most of Inc.'s shares in International were in the form of Class B common stock that had a 10-1 voting preference over the Class A common shares held by International's public shareholders. Thus, Inc. was the controlling shareholder of International even though it owned a minority of the equity interest. As a controlling shareholder, Inc. had a fiduciary duty of undivided loyalty to International, which among other things, required Inc. to refrain from acting to benefit itself or anyone else at International's expense, and to disclose all material facts to International's independent directors regarding any transactions involving International and Inc.

      d.     The Ravelston Corporation Limited ("Ravelston") was an Ontario corporation with its principal office located in Toronto, Canada. Ravelston was a privately held corporation, with 98.5 % of its equity owned by officers and directors of International and Inc., and 1.5 % owned by the estate of a former Inc. director. Ravelston's principal asset was its controlling interest in Inc., which it held directly and through various subsidiaries, and which was approximately 78% of Inc.'s equity during the relevant time period. Thus, Ravelston was the controlling shareholder of

2

International through its controlling interest in Inc. As the controlling shareholder, Ravelston had a fiduciary duty of undivided loyalty to International, which among other things, required Ravelston to refrain from acting to benefit itself or anyone else at International's expense, and to disclose all material facts to International's independent directors regarding any transactions involving International and Ravelston.

e.    Defendant CONRAD M. BLACK, who was trained as an attorney, was a Canadian citizen until 1999, when he became a dual citizen of Canada and the United Kingdom. In 2000, BLACK became a member of the House of Lords in the United Kingdom. Black resided in Toronto, London and Palm Beach, Florida. In addition, during the relevant time period, he often stayed at an apartment in New York City. The apartment was owned by International until December 2000, at which time BLACK purchased the apartment from International. BLACK, through Conrad Black Capital Corporation, owned approximately 65.1 % of Ravelston. BLACK was Chief Executive Officer and Chairman of the Board of Directors of Ravelston, Inc. and International. At International, BLACK's duties were to oversee International's operations, finances and corporate strategy, including all significant acquisitions and sales of assets. As a controlling shareholder, officer and director of International, BLACK had a fiduciary duty of undivided loyalty to International, which among other things, required BLACK to refrain from acting to benefit himself or anyone else at International's expense, and to disclose all material facts to International's independent directors regarding any transactions involving International and any of International's officers, directors and controlling shareholders.

f.    Defendant JOHN A. "Jack" BOULTBEE, who was a Chartered Accountant in Canada, was a Canadian citizen who resided in the Toronto area. BOULTBEE, through Mowitza Holdings, Inc., owned approximately .98 % of Ravelston. BOULTBEE was: (1) Chief Financial Officer of Ravelston; (2) Chief Financial Officer, Executive Vice President and a director of Inc.; and (3) Executive Vice President and, for a period of time, Chief Financial Officer, of International. At International, BOULTBEE's principal duties were to oversee finances, including matters relating

3

to taxes. As an officer of International, BOULTBEE had a fiduciary duty of undivided loyalty to International, which among other things, required BOULTBEE to refrain from acting to benefit himself or anyone else at International's expense, and to disclose all material facts to International's independent directors regarding any transactions involving International and any of International's officers, directors and controlling shareholders.

        g.    Defendant PETER Y. ATKINSON, who was a licensed attorney in Canada, was a Canadian citizen who resided in the Toronto area. ATKINSON owned .98 % of Ravelston. ATKINSON was Vice President and General Counsel of Inc., and Executive Vice President of International. ATKINSON's principal duties at International were to oversee legal affairs. As an officer of International, ATKINSON had a fiduciary duty of undivided loyalty to International, which among other things, required ATKINSON to refrain from acting to benefit himself or anyone else at International's expense, and to disclose all material facts to International's independent directors regarding any transactions involving International and any of International's officers, directors and controlling shareholders.

        h.    Defendant MARK S. KIPNIS was a United States citizen and an experienced attorney licensed in Illinois to practice law. KIPNIS has a B.S. degree in accounting and has been an attorney specializing in transactional law since 1974. KIPNIS was Vice President, Corporate Counsel and Secretary of International, and worked at International's office in Chicago. In this position, KIPNIS's duties included: (1) documenting and closing the purchases and sales of newspapers by International and its subsidiaries; (2) preparing International's annual proxy statement, which was distributed to International's shareholders in advance of International's annual shareholder meeting and which was filed with the United States Securities and Exchange Commission ("SEC"); (3) acting as secretary at meetings of International's Board of Directors and Audit Committee, and as keeper of the official corporate minute books; (4) preparing the agenda and collecting materials for the directors in connection with the meetings of International's Board of Directors and Audit Committee, and distributing the agenda and materials to the directors in advance

4

of the meetings; and (5) presenting all related party transactions to International's Audit Committee, which functioned as International's independent director committee, for its review and approval. As International's in-house attorney, KIPNIS had a fiduciary duty of undivided loyalty to International, which among other things, required KIPNIS to disclose all material facts regarding all related party transactions to International's Audit Committee, and to refrain from assisting others in any breach of fiduciary duty against International.

      i.      F. David Radler was a Canadian citizen who resided in Vancouver, Canada. During the relevant time period, he often stayed at an apartment in Chicago that was owned by International, and often worked at International's office in Chicago. Radler, through FDR Ltd., owned approximately 14.2 % of Ravelston, of which he was President. Radler was the Deputy Chairman of the Board of Directors, the President and the Chief Operating Officer of both International and Inc. At International, Radler's principal duties were to manage the newspaper operations of the company in the United States and parts of Canada. On those occasions when International or its subsidiaries bought or sold newspapers, Radler often was involved in negotiating the business terms of those transactions. As an officer and director of International, Radler had a fiduciary duty of undivided loyalty to International, which among other things, required Radler to refrain from acting to benefit himself or anyone else at International's expense, and to disclose all material facts to International's independent directors regarding any transactions involving International and any of International's officers, directors and controlling shareholders.

### Ravelston's Management of International

      j.      BLACK, Radler, BOULTBEE and ATKINSON were not employees of International, but rather of Ravelston. The services of these executives, along with certain accounting, financial reporting and other administrative functions, were provided by Ravelston to International pursuant to a management services agreement between the two companies. The management services agreement, which was signed by KIPNIS on behalf of International and was dated as of January 1, 1998, provided that International and Ravelston would meet at least annually

5

to determine whether Ravelston would continue to provide these services to International and at what fee. The fee was to be determined through negotiations between Ravelston and a committee of International's independent directors. In the agreement Ravelston represented and promised that it would discharge its duties thereunder honestly, in good faith, and in the best interest of International. The agreement further stated that Ravelston would provide the details of any conflict of interest involving Ravelston's performance of its management services to the Secretary of International, namely KIPNIS, whose job and fiduciary duty it was to present all material facts concerning all related party transactions to International's Audit Committee for its review and approval. Unless specifically authorized by International's Audit Committee, BLACK, Radler, BOULTBEE and ATKINSON received all of their compensation for their work at International, including all bonuses, from Ravelston.

k.       Through his controlling interest in Ravelston, BLACK had an indirect ownership interest in Inc. of approximately 51%. Additionally, through his ownership interest in Inc., BLACK had an indirect ownership interest in International of approximately 15%. Despite having only a minority ownership in International, BLACK was able to maintain voting control over International though Inc.'s ownership of International's "super-voting" Class B Common Stock. The result of International's ownership structure was that every $100 transferred out of International and into Inc. would effectively "cost"(BLACK) $15 but give him $51 as Inc.'s controlling shareholder, thereby tripling his funds at the direct expense of International's non-controlling shareholders. Similarly, every $100 that was transferred out of International and into Ravelston again would cost BLACK $15, but give him $65. As for funds transferred out of International directly to BLACK, he would receive the full amount of the funds, forgoing his 15% equity stake in International. Thus, BLACK was in a position to exert both his management position and voting control at International to transfer money to himself, and away from International's non-controlling and public shareholders, at a very low cost given his minority equity stake in International.

6

## U.S. Community Asset Sales and Non-Competition Agreements

l.       Starting in May of 1998, and continuing through 2001, International embarked on a business plan to sell off nearly all of its United States community newspaper assets. In May 1998, an International subsidiary sold a publication called *American Trucker* and several other smaller publications to Intertec Publishing Company for a total amount of approximately $75 million ("the *American Trucker* transaction"). In addition, from early 1999 through late 2000, International and its subsidiaries sold virtually all of International's United States community newspapers (except for those in the Chicago metropolitan area), in a series of sales to a variety of purchasers. These transactions were as follows:

| Purchaser | Total Amount (approx.) | Closing Date | Referred To Herein As |
|---|---|---|---|
| Community Newspaper Holdings Inc. | $472 million | 2/1/99 | "CNHI I" |
| Horizon Publications Inc. | $43.7 million | 3/31/99 | "Horizon" |
| Forum Communications Inc. | $14 million | 9/30/00 | "Forum" |
| PMG Acquisition Corp. | $59 million | 10/2/00 | "Paxton" |
| Newspaper Holdings Inc. | $90 million | 11/1/00 | "CNHI II" |

Newspaper Holdings Inc. was a subsidiary of Community Newspaper Holdings Inc. Horizon Publications Inc. was owned by Radler, KIPNIS and other International executives. None of the other purchasers had any ownership relationship to or with International.

m.       Radler supervised the negotiations of the business terms of each of the transactions set forth in subparagraph k. KIPNIS participated in the documentation and closing of each transaction.

n.       The closing documents for each of the transactions set forth in subparagraph k. included a non-competition agreement signed by International, whereby International promised not to acquire or establish a newspaper within a certain geographic distance from the newspapers it sold for a certain period of time after the sale. It was not unusual for transactions in the newspaper business to include a non-competition agreement signed by the seller. This was so because

7

newspaper purchasers buy not just the trade name of the newspaper, but also its subscriber and advertiser bases. Purchasers often request the seller's agreement not to return to the same area in a short period of time and operate a rival newspaper. For commercial and tax purposes, it is not unusual for the buyer and seller to allocate a portion of the sales proceeds towards the seller's non-competition agreement. The buyer, however, typically does not pay additional consideration for a separate agreement that prohibits the seller's affiliates and officers from personally competing with the buyer.

o.    In connection with the non-competition agreements in the transactions set forth in subparagraph l, the fiduciary duty of loyalty owed by BLACK, BOULTBEE, ATKINSON, KIPNIS and Radler to International required each of them to use his skill and ability to maximize International's share of the proceeds allocated to the non-competition agreement and to refrain from acting to International's detriment. If one of International's controlling shareholders, officers or directors received a portion of the proceeds allocated to the non-competition agreement, all of the above-named defendants and Radler and Ravelston, as well as any other knowledgeable officer, director or controlling shareholder of International, had a fiduciary duty to disclose this fact to International's Audit Committee, so that the independent directors could review the transaction and ensure its fairness to International.

p.    In 1996, a tax court in Canada held that, under the facts of that case, non-competition fees were not taxable under Canadian tax law. In December 1999, a Canadian federal court of appeal affirmed this decision. These court decisions created a potential tax benefit for Canadian taxpayers who legitimately received non-competition payments. BLACK, BOULTBEE, ATKINSON and Radler were Canadian taxpayers. BOULTBEE was extremely knowledgeable about tax law and was the architect of much of the tax strategy employed by International, Inc. and the defendants.

## SEC Disclosures

q.    As a publicly traded company, International was obligated to make regular

filings with the United States Securities and Exchange Commission ("SEC"), and was obligated in those filings to disclose all material facts about the company to investors. Among other things, International was required to fully and accurately disclose in its SEC filings related party transactions and compensation paid to its officers and directors.

### General Scheme Allegations

2.      Beginning no later than in or about January 1999 and continuing thereafter until at least in or about May 2001, at Chicago, in the Northern District of Illinois, Eastern Division and elsewhere,

<div align="center">

CONRAD M. BLACK,
JOHN A. BOULTBEE,
PETER Y. ATKINSON and
MARK S. KIPNIS,

</div>

defendants herein, along with others known and unknown to the grand jury, devised, intended to devise, and participated in a scheme to defraud International and International's public shareholders of money, property and their intangible right of honest services, and to obtain money and property from these victims by means of materially false and fraudulent pretenses, representations, promises and omissions, in connection with the U.S. Community Newspaper Asset Sales. This scheme is further described below.

3.      It was part of the scheme that, in connection with the U.S. Community asset sales, Ravelston and its agents, including BLACK, BOULTBEE, ATKINSON and Radler, repeatedly abused their authority and fiduciary obligations as managers of International in order to fraudulently benefit themselves at the expense of International and its public shareholders. On multiple occasions, Ravelston's agents fraudulently inserted themselves and Inc. as recipients of non-competition fees that should have, and otherwise would have, been paid exclusively to International. Ravelston and its agents failed to disclose their self-dealing to International's Audit Committee, thereby enabling Ravelston and its agents to conceal the scheme, continue as International's managers, and quietly siphon away International assets. Ravelston's agents also abused their positions as International's managers by fraudulently causing International to mischaracterize bonus

<div align="center">9</div>

compensation payments to them as non-competition fees, in order to receive a tax benefit in Canada. KIPNIS aided and abetted this scheme by implementing the directives of Ravelston's agents and by failing to disclose this misconduct to International's Audit Committee. As a result of this scheme, defendants and their co-schemers fraudulently diverted over $32 million from International, and fraudulently deprived International of its right to receive their honest services.

### *American Trucker*

4.  It was further part of the scheme that Ravelston, BLACK, BOULTBEE, Radler, KIPNIS and others defrauded International in connection with the *American Trucker* transaction. On or about May 11, 1998, International (through a subsidiary) sold the *American Trucker* and *Mine and Quarry Trader* publications to Intertec Publishing Corporation ("Intertec") for approximately $75 million. The closing documents provided that $2 million of the sales proceeds was being paid to International as consideration for its assent to a non-competition agreement. Radler signed the asset purchase agreement and non-competition agreement on behalf of International. Intertec did not request or receive a non-competition agreement from Inc. as part of the transaction.

5.  It was further part of the scheme that in or about January 1999, approximately eight months after the *American Trucker* transaction was concluded, Ravelston's agents, including BLACK, BOULTBEE and Radler, decided that they would divert the $2 million that International received for the *American Trucker* non-competition agreement to Inc. Consistent with this decision, Ravelston's agents caused the Executive Vice-President of International's Community Newspaper Division to send a memorandum, on January 27, 1999, to the Assistant Treasurer of International on which Radler was copied. The memorandum falsely stated that the $2 million from the *American Trucker* deal allocated to International's non-competition agreement "was actually for [Inc.] as compensation for the Non-Compete as specified in the *American Trucker* transaction."

6.  It was further part of the scheme that on or about February 1, 1999, KIPNIS signed a $2 million check that International issued and sent to Inc. These funds purportedly represented the entire $2 million non-competition agreement allocation from the *American Trucker* transaction to

10

Inc. as compensation for Inc.'s assent to a non-competition agreement. Ravelston's agents and KIPNIS knew that Inc. had never signed or been asked to sign a non-competition agreement in the *American Trucker* transaction. Furthermore, Inc. did not present a competitive threat to any of the publications sold in the *American Trucker* transaction, and Inc. did not employ staff who could manage newspaper properties in the United States other than the staff already working for International, which was already subject to the non-competition agreement.

7.      It was further part of the scheme that Ravelston, BLACK, BOULTBEE, Radler, KIPNIS and others failed to disclose the $2 million payment from International to Inc. as a related party transaction to International's Audit Committee, thereby breaching their fiduciary duty, fraudulently depriving International of honest services, and concealing the scheme. The $2 million payment to Inc. was a breach of the fiduciary duty that defendants and their co-schemers owed to International, which required them to seek to maximize the benefit to International from the *American Trucker* transaction. The $2 million payment was a theft of International's corporate assets and a fraudulent deprivation of honest services by all International agents who were involved. Ravelston benefitted by these thefts because it owned a greater percentage of Inc. than it did of International. Thus, by fraudulently moving the non-compete proceeds of the *American Trucker* transaction "up" from International to Inc., Ravelston and its controlling shareholders would effectively receive a larger portion of the non-compete proceeds than they would have otherwise received.

**CNHI 1**

8.      It was further part of the scheme that Ravelston, BLACK, BOULTBEE, Radler, KIPNIS and others defrauded International in connection with the CNHI 1 transaction. On or about February 1, 1999, International sold certain of its newspaper assets to Community Newspaper Holdings, Inc. ("CNHI") for approximately $472 million. The deal letter for the CNHI 1 transaction, signed in December 1998, provided that International would sign a non-competition agreement and that $50 million of the transaction proceeds would be paid to International as consideration for its

covenant not to compete.

9.      It was further part of the scheme that in or about January 1999, Ravelston's agents, including BLACK, BOULTBEE and Radler, decided that Inc. would be inserted as a non-competition covenantor, and that Inc. would receive $12 million of the $50 million allocated to the non-competition agreement (approximately 25%). BLACK, BOULTBEE, Radler and KIPNIS were aware that CNHI had not requested that Inc. be added to the non-competition agreement.

10.     It was further part of the scheme that in late-January 1999, only days before the February 1, 1999 closing, KIPNIS inserted Inc. into the closing documents as a non-compete covenantor. The final covenant not to compete falsely stated that CNHI "was not willing to enter into the Exchange Agreement and Lenders are not willing to provide financing to [CNHI] for the acquisition of the Newspapers unless Covenantors execute this Agreement." KIPNIS signed the asset purchase agreement and non-competition agreement on behalf of International, and Radler signed the non-competition agreement on behalf of Inc. Both KIPNIS and Radler signed the non-competition agreements knowing full well that CNHI was willing to enter into the transaction without Inc.'s non-compete agreement.

11.     It was further part of the scheme that at the closing of the CNHI 1 transaction on February 1, 1999, KIPNIS caused $12 million of the transaction proceeds to be wire transferred directly to Inc. instead of International. The $12 million payment to Inc. was a breach of the fiduciary duty that defendants and their co-schemers owed to International, which required them to seek to maximize the benefit to International from the transaction. The $12 million payment was a theft of International's corporate opportunity and a fraudulent deprivation of honest services by all International agents who were involved. Ravelston benefitted by these thefts because it owned a greater percentage of Inc. than it did of International. The $12 million payment to Inc. at International's expense was a related party transaction. Ravelston, its agents and KIPNIS others failed to disclose this related party transaction to International's Audit Committee, thereby breaching their fiduciary duty, fraudulently depriving International of honest services, and concealing the

12

scheme.

12.    It was further part of the scheme that in February 1999, Ravelston's agents caused Inc. to use the $14 million that it had fraudulently obtained in connection with the *American Trucker* ($2 million) and CNHI 1 ($12 million) transactions to pay down an overdue debt that Inc. owed to International. Thus, by "round-tripping" the funds that they had fraudulently obtained from International, Ravelston's agents had effectively caused International to repay itself a significant portion of Inc.'s overdue debt. The $14 million in payments to Inc. at International's expense, and Inc.'s subsequent use of those funds to "repay" International were related party transactions. Ravelston and its agents failed to disclose these related party transactions to International's Audit Committee, thereby breaching their fiduciary duty, fraudulently depriving International of honest services, and concealing the scheme.

### The Template

13.    It was further part of the scheme that, in or about January 1999, Ravelston's agents, including BLACK, BOULTBEE and Radler, decided that, in connection with all future sales of International's U.S. community newspapers, Inc. would be inserted as a non-compete covenantor as a matter of course, and would receive 25% of the proceeds allocated to the non-competition agreement in each transaction. This decision, of which KIPNIS was aware and helped implement, was known as the "template." KIPNIS was present at the time the decision to implement the template was made, and characterized it as having been made by "Toronto" — a reference to Ravelston's agents based in Toronto, Canada. The decision to initiate the template in all future transactions would effectively siphon off 25% of any proceeds allocated to International's non-competition agreement regardless of whether the buyer requested or valued Inc.'s agreement not to compete. The implementation of the template was a breach of the fiduciary duty that defendants and their co-schemers owed to International, which required them to seek to maximize the benefit to International from these transactions. The decision to create and implement the template, which would result in payments to Inc. at International's expense, also was a plan to engage in a series of

13

related party transactions. Ravelston, BLACK, BOULTBEE, Radler, KIPNIS and others failed to disclose the plan to implement the template to International's Audit Committee, thereby breaching their fiduciary duty, fraudulently depriving International of honest services, and concealing the scheme.

<h3 style="text-align:center">Horizon</h3>

14.     It was further part of the scheme that Ravelston, BLACK, BOULTBEE, Radler, KIPNIS and others defrauded International in connection with the Horizon transaction. Horizon was a privately-owned newspaper company in which BLACK and Radler owned substantial interests. In a transaction agreement dated March 31, 1999, International agreed to sell certain newspapers and specialty publications to Horizon for approximately $43.7 million. Ravelston's agents, including BLACK, BOULTBEE and Radler, decided that the amount allocated to the non-competition agreement would be $5 million, and that, pursuant to the template, both International and Inc. would sign the non-competition agreement, with International receiving $3.8 million of the non-competition allocation and Inc. receiving $1.2 million of the non-competition allocation.

15.     It was further part of the scheme that at the closing of the Horizon transaction, on June 30, 1999, KIPNIS helped implement the template by including Inc. in the transaction documents, and causing $1.2 million to be wire transferred to Inc. in August 1999 when Horizon received the funding necessary to close the transaction. KIPNIS signed the asset purchase agreement and non-competition agreement on behalf of International, and Radler signed the non-competition agreement on behalf of Inc. Thus, in the Horizon transaction, Ravelston's agents, including BLACK, BOULTBEE and Radler, had in essence, negotiated an agreement with themselves (Inc.), not to compete against themselves (Horizon), resulting in them paying themselves (Inc.) approximately $1.2 million. The $1.2 million payment to Inc. was a breach of the fiduciary duty that defendants and their co-schemers owed to International, which required them to seek to maximize the benefit to International from the transaction. The $1.2 million payment was a theft of International's corporate opportunity and a fraudulent deprivation of honest services by all International agents who

<div style="text-align:center">14</div>

were involved. Ravelston again benefitted by this theft because it owned a greater percentage of Inc. than it did of International. The $1.2 million payment to Inc. at International's expense was a related party transaction. Ravelston, BLACK, BOULTBEE, Radler, KIPNIS and others failed to disclose this related party transaction to International's Audit Committee, thereby breaching their fiduciary duty, fraudulently depriving International of honest services, and concealing the scheme.

## Individual Non-Competition Payments

16.     It was further part of the scheme that, in the summer of 2000, BLACK, BOULTBEE, ATKINSON and Radler decided that, with respect to anticipated transactions with Forum, Paxton and CNHI II, they would insert themselves as individual non-compete covenantors and would divert a portion of the proceeds of each of these transactions to themselves as bonus compensation. The decision to characterize these payments as "non-competition" payments, as opposed to bonus compensation, was motivated, at least in part, by a desire to receive favorable tax treatment in Canada, where legitimate non-competition payments potentially received tax-advantaged treatment. These payments were to be above and beyond the funds allocated to the non-competition agreement in the transaction by the parties, which would continue to be divided between International and Inc. pursuant to the template. This decision, of which KIPNIS was aware and helped implement, was a breach of the fiduciary duty that defendants and their co-schemers owed to International, which required them to seek to maximize the benefit to International from these transactions. BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS failed to disclose their plan to pay themselves bonus compensation and mischaracterized these payments as "non-competition fees" to International's Audit Committee, thereby breaching their fiduciary duty, fraudulently depriving International of honest services, and concealing the scheme at International's expense.

## Forum and Paxton

17.     It was further part of the scheme that Ravelston, BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS defrauded International in connection with the Forum and Paxton transactions. On or about September 30, 2000, International entered into an Asset Purchase Agreement to sell

15

certain newspapers to Forum Communications Co. for $14 million, $400,000 of which was allocated to non-competition agreements. On or about October 2, 2000, International entered into an Asset Purchase Agreement to sell certain newspapers to Paxton for approximately $59 million, $2 million of which was allocated to non-competition agreements. Pursuant to the template established by Ravelston's agents, in both transactions KIPNIS inserted International and Inc. as non-compete covenantors, and proposed that the amount allocated to the non-competition agreement be split 75% to International and 25% to Inc. As in prior transactions, Inc. was included as a non-compete covenantor because KIPNIS, purportedly acting on behalf of International, inserted it as such. Neither Forum nor Paxton ever requested that Inc. be included as a non-compete convenantor.

18.    It was further part of the scheme that KIPNIS signed the Forum and Paxton asset purchase agreements on behalf of International, and the non-competition agreements on behalf of both International and Inc. At the closings on or about September 30, 2000 (Forum) and October 2, 2000 (Paxton), KIPNIS caused $100,000 and $500,000, respectively, to be wire transferred to Inc. The decision in the Forum and Paxton transactions to include Inc. as a recipient of 25% of the funds allocated to the non-competition agreement, and the implementation of that decision, were breaches of the fiduciary duty that defendants and their co-schemers owed to International, which required them to seek to maximize the benefit to International from these transactions. The $100,000 and $500,000 payments were thefts of International's corporate opportunities and fraudulent deprivations of honest services by all International agents who were involved. As in prior transactions, Ravelston benefitted by these thefts because it owned a greater percentage of Inc. than it did of International. The $100,000 and $500,000 payments to Inc. at International's expense were related party transactions. Ravelston, BLACK, BOULTBEE, Radler, KIPNIS and others failed to disclose these related party transactions to International's Audit Committee, thereby breaching their fiduciary duty, fraudulently depriving International of honest services, and concealing the scheme.

19.    It was further part of the scheme that at the time of the Forum and Paxton transactions, Radler believed that, consistent with their plan, BLACK, BOULTBEE, ATKINSON

16

and Radler had been inserted as non-compete covenantors by KIPNIS in the Forum and Paxton closing documents, and that 3 % of the proceeds of each transaction had been set aside to fund the non-compete payments to the four International officers.

20. It was further part of the scheme that, in the spring of 2001, BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS realized that a portion of the proceeds from the Forum and Paxton transactions had not, in fact, been set aside from the transactions to fund the anticipated individual non-compete payments. Moreover, BLACK, BOULTBEE, ATKINSON and Radler had never been inserted as non-compete covenantors in the closing documents. After realizing the "mistake," Radler examined International's reserve accounts from the Forum and Paxton transactions – which had closed almost six months prior – and determined that $600,000 could diverted from those reserves and paid to BLACK, BOULTBEE, ATKINSON and Radler as non-competition payments.

21. It was further part of the scheme that on or about April 9, 2001, BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS caused a subsidiary of International to pay a total of $600,000 to BLACK, BOULTBEE, ATKINSON and Radler as "supplemental non-competition payments." The "supplemental non-competition payments" were made to the defendants despite the fact that none of them had signed a non-competition agreement in connection with the Forum or Paxton transactions. These payments were thefts of International's corporate assets and fraudulent deprivations of honest services by all International agents who were involved. The payments to the individuals at International's expense also were related party transactions. BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS failed to disclose these related party transactions to International's Audit Committee, thereby breaching their fiduciary duty, fraudulently depriving International of honest services, and concealing the scheme.

## CNHI II

22. It was further part of the scheme that Ravelston, BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS defrauded International in connection with the CNHI II transaction. On or about November 1, 2000, International sold additional newspapers to CNHI for approximately $90 million.

17

Pursuant to the "template" established by Ravelston's agents, Inc. was inserted into the CNHI asset purchase agreement by KIPNIS as a non-compete covenantor. The asset purchase agreement, dated September 28, 2000, allocated $3 million of the purchase price to International and Inc.'s non-competition agreements — $2.25 million to International (75%) and $750,000 to Inc. (25%). Inc. was included as a non-compete covenantor because KIPNIS, purportedly acting on behalf of International, inserted it as such. As in the first CNHI transaction, however, CNHI had not requested that Inc. be included as a non-compete covenantor in the transaction.

23.     It was further part of the scheme that in or about late October of 2000, several days before the closing of the CNHI II transaction, KIPNIS, purportedly acting on behalf of International, advised CNHI representatives that International wanted to insert BLACK, BOULTBEE, ATKINSON and Radler as covenantors to the non-competition agreement (in addition to International and Inc.).     CNHI agreed to allow the four individuals to be added to the non-competition agreement as covenantors, and the non-competition agreement was modified to reflect this fact. CNHI did not care if the number of covenantors was increased, so long as doing so did not increase CNHI's purchase price. BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS were fully aware that CNHI had not requested that any individuals be added as covenantors to the non-competition agreement with International. CNHI representatives had not even heard of some of the International officers whom KIPNIS proposed adding as covenantors to the non-competition agreement.

24.     It was further part of the scheme that, just prior to the closing, BLACK directed Radler to allocate approximately $9.5 million of the transaction proceeds to the non-competition agreements for BLACK, BOULTBEE, ATKINSON and Radler. Radler conveyed this directive to KIPNIS. BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS were fully aware that the $9.5 million allocated to the individuals as compensation for non-competition agreements would have otherwise been paid to International as proceeds of the CNHI II transaction.

25.     It was further part of the scheme that at the closing on or about November 1, 2000,

18

KIPNIS signed the asset purchase agreement on behalf of International, and the non-competition agreements on behalf of International, Inc., BLACK, BOULTBEE, ATKINSON and Radler. Although Inc. and the four International officers were added to the non-competition agreement solely at KIPNIS' request, the final non-competition agreement falsely stated that CNHI "was not willing to enter into the Purchase Agreement for the acquisition of the Newspapers unless Covenantor executes this Agreement." KIPNIS signed the non-competition agreement knowing full well that CNHI was willing to enter into the transaction without Inc. or the four individuals' non-compete agreement.

26.     It was further part of the scheme that, at the closing on or about November 1, 2000, pursuant to Inc.'s non-competition agreement, KIPNIS caused $750,000 to be wire transferred to Inc. Furthermore, at the closing on or about November 1, 2000, KIPNIS attempted to convince CNHI to wire transfer the $9.5 million non-competition payment directly to BLACK, BOULTBEE, ATKINSON and Radler. CNHI refused, in part because it had never heard of BOULTBEE or ATKINSON. CNHI, however, agreed to allow KIPNIS to handwrite the names and disbursement amounts for the four International officers receiving non-compete payments on the bank's wiring instructions. KIPNIS subsequently arranged for the $9.5 million in non-compete payments to be sent to American Publishing Company, a subsidiary of International.

27.     It was further part of the scheme that in late November 2000, KIPNIS caused an American Publishing Company subsidiary to issue checks totaling $9.5 million to BLACK, BOULTBEE, ATKINSON and Radler. At the same time, KIPNIS also caused an American Publishing Company subsidiary to issue a bonus check to himself in the amount of $100,000. The decision in the CNHI II transaction to propose Inc. and the four International officers as recipients of the funds allocated to the non-competition agreement, and the implementation of that decision, were breaches of the fiduciary duty that defendants and their co-schemers owed to International, which required them to seek to maximize the benefit to International from the transaction. The $750,000 payment to Inc. and the $9.5 million payment to the four International officers were thefts

19

of International's corporate opportunity and a fraudulent deprivation of honest services by all International agents who were involved. Ravelston and its agents benefitted by this theft directly, and because they owned a greater percentage of Inc. than they did of International. The $750,000 payment to Inc. and the $9.5 million payment to the four International officers were both at International's expense and were related party transactions. Ravelston, BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS failed to disclose these related party transactions to International's Audit Committee, thereby breaching their fiduciary duty, fraudulently depriving International of honest services, and concealing the scheme.

### February 2001 Payments

28.   It was further part of the scheme that, in February 2001, BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS fraudulently mischaracterized bonus payments to the four International officers as non-competition payments. The four International officers decided that they would pay themselves, purportedly on behalf of International, a bonus of $5.5 million. The four International officers further decided to label these payments as non-competition payments, rather than bonus compensation, in order to take advantage of the potential tax benefits that genuine non-competition payments received under Canadian tax laws.

29.   It was further part of the scheme that KIPNIS helped implement this decision by preparing non-competition agreements between American Publishing Company (an International subsidiary) and each of the four International officers, and then signing the agreements on behalf of American Publishing Company. In the agreements, which were backdated to December 31, 2000, BLACK, BOULTBEE, ATKINSON and Radler each promised not to compete with American Publishing Company for three years after he left International's employ. These agreements were a contrivance created for the purpose of facilitating favorable tax treatment from the Canadian tax authorities. American Publishing Company was the subsidiary through which International had owned its United States community newspapers outside the Chicago area. By the time these agreements were signed, however, International had sold all of these newspapers but one – a small

20

weekly newspaper in Mammoth Lake, California. International was in the process of attempting to sell that newspaper and had no intent of re-entering the community newspaper business in the United States, and defendants knew that there was no legitimate justification for these non-competition agreements. BLACK, BOULTBEE, ATKINSON and Radler had signed a $5.5 million agreement not to compete in the newspaper business with a company that was, for all intents and purposes, no longer in the newspaper business.

30. It was further part of the scheme that, in or about February 2001, BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS caused an American Publishing Company subsidiary to issue checks totaling $5.5 million to BLACK, BOULTBEE, ATKINSON and Radler. KIPNIS arranged for the delivery of the checks which, like the non-competition agreements, were backdated to December 31, 2000. The issuance of these checks, as well as the preparation and signing of the fraudulent non-competition agreements, were breaches of the fiduciary duty owed by BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS because they were benefitting themselves to the detriment of International. These payments were fraudulent deprivations of International's right to receive honest services from its officers, directors and controlling shareholder. The payments to the individuals at International's expense also were related party transactions. BLACK, BOULTBEE, ATKINSON, Radler and KIPNIS failed to investigate and fully disclose the actual nature of these related party transactions to International's Audit Committee, thereby breaching their fiduciary duty, fraudulently depriving International of honest services, and concealing the scheme.

32. It was further part of the scheme that defendants and their co-schemers used the United States mail, commercial interstate couriers and the interstate wires to execute the scheme. For example, KIPNIS sent transaction documents to others by interstate facsimile, e-mail and commercial interstate couriers. Money was wire transferred in interstate commerce. Checks were delivered by commercial interstate carriers. KIPNIS sent out packages of materials to the International Audit Committee by facsimile, e-mail and commercial interstate carriers.

33. It was further part of the scheme that defendants and their co-schemers did

21

misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden, acts done in furtherance of the scheme and the purpose of those acts, beyond those acts of concealment set forth above.

34.    On or about February 8, 2001, at Chicago, in the Northern District of Illinois, Eastern Division,

<div align="center">
CONRAD M. BLACK,<br>
JOHN A. BOULTBEE,<br>
PETER Y. ATKINSON and<br>
MARK S. KIPNIS,
</div>

defendants herein, along with co-schemer F. David Radler, for the purpose of executing and attempting to execute the above-described scheme, did knowingly cause to be deposited for delivery by an interstate carrier from Chicago, Illinois, an envelope addressed to ATKINSON in Toronto, Canada, to be sent and delivered by an interstate carrier, namely, Federal Express, according to the directions thereon, which envelope contained Noncompetition Agreements with American Publishing Company to be executed by certain International officers, and approximately $2.9 million in checks as consideration for those agreements;

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## COUNT TWO

The UNITED STATES ATTORNEY further charges:

1.    The United States Attorney realleges and incorporates by reference paragraphs 1 through 33 of Count One of this Indictment as though fully set forth herein.

2.    On or about August 19, 2000, at Chicago, in the Northern District of Illinois, Eastern Division,

### MARK S. KIPNIS,

defendant herein, along with co-schemers Conrad M. Black, F. David Radler, John A. Boultbee, Peter Y. Atkinson and Ravelston, for the purpose of executing and attempting to execute the above-described scheme, did knowingly cause to be deposited for delivery by an interstate carrier from Chicago, Illinois, an envelope addressed to the attorney for Forum Communications Inc. in Fargo, North Dakota, to be sent and delivered by an interstate carrier, namely: Federal Express, according to the directions thereon, which envelope contained a transaction documents relating to International's September 30, 2000 sale of certain newspapers to Forum, including a Noncompetition Agreement, wire transfer instructions for the Noncompetition Agreement and an Asset Purchase Agreement;

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

23

## COUNT THREE

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference paragraphs 1 through 33 of Count One of this Indictment as though fully set forth herein.

2.     On or about September 5, 2000, at Chicago, in the Northern District of Illinois, Eastern Division,

### MARK S. KIPNIS,

defendant herein, along with co-schemers Conrad M. Black, F. David Radler, John A. Boultbee, Peter Y. Atkinson and Ravelston, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted in interstate commerce from Nashville, Tennessee, to Chicago, Illinois, by means of wire and radio communications, certain writings, signs, and signals, namely: an e-mail transmission of a draft Asset Purchase Agreement for International's October 2, 2000 sale of certain newspapers to PMG Acquisition Corp. ("Paxton");

In violation of Title 18, United States Code, Sections 1343, 1346 and 2.

24

## **COUNT FOUR**

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference paragraphs 1 through 33 of Count One of this Indictment as though fully set forth herein.

2.     On or about October 24, 2000, at Chicago in the Northern District of Illinois, Eastern Division,

### MARK S. KIPNIS,

defendant herein, along with co-schemers Conrad M. Black, F. David Radler, John A. Boultbee, Peter Y. Atkinson and Ravelston, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted in interstate commerce from Chicago, Illinois, to Charlotte, North Carolina, by means of wire and radio communications, certain writings, signs, and signals, namely: a facsimile transmission wire transfer instructions for the proceeds of International's November 1, 2000 sale of certain newspapers to CNHI;

In violation of Title 18, United States Code, Sections 1343, 1346 and 2.

25

## COUNT FIVE

The UNITED STATES ATTORNEY further charges:

1.    The United States Attorney realleges and incorporates by reference paragraphs 1 through 33 of Count One of this Indictment as though fully set forth herein.

2.    On or about November 21, 2000, at Chicago in the Northern District of Illinois, Eastern Division,

<div align="center">

CONRAD M. BLACK,
JOHN A. BOULTBEE,
PETER Y. ATKINSON and
MARK S. KIPNIS,

</div>

defendants herein, along with co-schemers F. David Radler and Ravelston, for the purpose of executing and attempting to execute the above-described scheme, did knowingly cause to be deposited for delivery by an interstate carrier an envelope addressed to MARK S. KIPNIS, to be sent and delivered by an interstate carrier, according to the directions thereon, which envelope contained a "non-competition" payment, in the form of a check made payable to Radler in the amount of $4,300,000;

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## COUNT SIX

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference paragraphs 1 through 33 of Count One of this Indictment as though fully set forth herein.

2.     On or about March 1, 2001, at Chicago in the Northern District of Illinois, Eastern Division,

CONRAD M. BLACK,
JOHN A. BOULTBEE,
PETER Y. ATKINSON and
MARK S. KIPNIS,

defendants herein, along with co-schemers F. David Radler and Ravelston, for the purpose of executing and attempting to execute the above-described scheme, did knowingly cause to be deposited for delivery by an interstate carrier an envelope addressed to MARK S. KIPNIS, to be sent and delivered by an interstate carrier, according to the directions thereon, which envelope contained Non-Competition Agreements with American Publishing Company executed by certain International officers;

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

27

## COUNT SEVEN

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference paragraphs 1 through 33 of Count One of this Indictment as though fully set forth herein.

2.     On or about April 9, 2001, at Chicago in the Northern District of Illinois, Eastern Division,

<div align="center">

CONRAD M. BLACK,
JOHN A. BOULTBEE,
PETER Y. ATKINSON and
MARK S. KIPNIS,

</div>

defendants herein, along with co-schemers F. David Radler and Ravelston, for the purpose of executing and attempting to execute the above-described scheme, knowingly did knowingly cause to be deposited for delivery by an interstate carrier an envelope addressed to MARK S. KIPNIS, to be sent and delivered by an interstate carrier, according to the directions thereon, which envelope contained "non-competition payments" in the form of checks totaling $600,000 made payable to BLACK, Radler, BOULTBEE and ATKINSON;

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## COUNT EIGHT

The UNITED STATES ATTORNEY further charges:

1.    The United States Attorney realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.    At times material herein:

a.    In 2000, International sold several hundred Canadian newspapers, an internet investment called Canada.com, and a fifty percent interest in the *National Post* to CanWest Global Communications Corp. The purchase price was approximately $2.1 billion (Cdn. $3.2 billion). The negotiations began in or about May 2000. The transaction agreement was dated July 30, 2000. The transaction closed on or about November 16, 2000. Approximately 2/3 of the assets sold were owned solely by International.

b.    BLACK negotiated the CanWest transaction. BOULTBEE, ATKINSON and KIPNIS participated in reviewing and finalizing the transaction. The transaction included non-competition agreements signed by International and others. The transaction documents for the CanWest transaction allocated approximately $51.8 million (Cdn. $80 million) to the non-competition agreements.

c.    In connection with the non-competition agreements in the CanWest transaction, the fiduciary duty of loyalty owed by BLACK, BOULTBEE, ATKINSON, KIPNIS, and Ravelston to International required each of them to use their skill and ability to maximize International's share of the proceeds allocated to the non-competition agreement and to refrain from acting to International's detriment. If one of International's controlling shareholders, officers or directors received a portion of the proceeds allocated to the non-competition agreement, all of the above-named defendants and Radler, as well as any other knowledgeable officer, director or controlling shareholder of International, had a fiduciary duty to truthfully disclose all material facts to International's Audit Committee, and to refrain from making any false or fraudulently misleading statements, so that the independent directors could review the transaction and ensure its fairness to

29

International.

## **General Scheme Allegations**

3.    Beginning no later than in or about May 2000 and continuing thereafter until at least in or about May 2002, at Chicago, in the Northern District of Illinois, Eastern Division and elsewhere,

<div align="center">
CONRAD M. BLACK,<br>
JOHN A. BOULTBEE,<br>
PETER Y. ATKINSON and<br>
MARK S. KIPNIS,
</div>

defendants herein, along with others known and unknown to the grand jury, devised, intended to devise, and participated in a scheme to defraud International and International's public shareholders of money, property and their intangible right of honest services, and to obtain money and property from these victims by means of materially false and fraudulent pretenses, representations, promises and omissions, in connection with the CanWest transaction. This scheme is further described below.

4.    It was part of the scheme that, in connection with the CanWest transaction, BLACK, BOULTBEE and ATKINSON fraudulently inserted BOULTBEE and ATKINSON as non-compete covenantors and fraudulently caused approximately $51.8 million (Cdn. $80 million) of the sale proceeds to be allocated to the non-competition agreements. BLACK, BOULTBEE, ATKINSON, KIPNIS, and Ravelston failed to properly disclose this self-dealing to International's Audit Committee, and caused false and misleading statements to be made to International's independent directors about the non-competition payments. Although International was the seller and signed a non-competition agreement, and International's Audit Committee was told that International would receive $2.6 million (Cdn. $4 million) for this agreement, the defendants caused all $51.8 million (Cdn. $80 million) – plus interest – to be distributed to BLACK, Radler, BOULTBEE, ATKINSON and Ravelston. International received nothing for its non-competition agreement. After an outside attorney discovered and questioned these payments during the course of a due diligence inquiry, BLACK, BOULTBEE, ATKINSON and KIPNIS returned to International's Audit Committee and

<div align="center">30</div>

sought ratification of the payments on different grounds, claiming that the information previously provided to the directors misdescribed the transaction in a number of "inadvertent" respects. In fact, the previous submission's falsehoods had not been inadvertent, and the second submission was false and misleading as well. After International's independent directors ratified these payments, BLACK then lied to International's shareholders about the payments at International 2002 annual shareholder meeting. As a result of this scheme, defendants and their co-schemers fraudulently diverted approximately $51.8 million (Cdn. $80 million) from International, and fraudulently deprived International of its right to receive their honest services.

### CanWest

5.     It was further part of the scheme that, on or about July 28, 2000, BLACK, BOULTBEE and ATKINSON fraudulently caused BOULTBEE and ATKINSON to be inserted into the CanWest transaction agreement as non-compete covenantors, and fraudulently caused approximately $51.8 million (Cdn. $80 million) of the sale proceeds to be allocated to the non-competition agreements. Prior to this date, CanWest had requested only that International, Ravelston, BLACK and Radler sign non-competition agreements, and the transaction agreement had not allocated any of the sales proceeds to such agreements. At the defendants' direction, the $51.8 million (Cdn. $80 million) that was allocated to the non-competition agreements was taken out of the proceeds that were to be paid to International as compensation for the newspapers that it was selling to CanWest.

6.     It was further part of the scheme that BLACK, BOULTBEE and ATKINSON agreed that BOULTBEE and ATKINSON would be inserted as non-compete covenantors, and as recipients of non-competition fees, as a mechanism for causing International to pay them a bonus. Until this time, International had never paid BOULTBEE or ATKINSON a bonus; all of their compensation had been paid by Ravelston and funded by the management fees. The defendants decided to label these payments as non-competition payments, rather than bonus compensation, in order to take advantage of the potential tax benefits that genuine non-competition payments received under

31

Canadian tax laws.

7.    It was further part of the scheme that, on or about September 1, 2000, KIPNIS prepared and sent a memorandum to International's Audit Committee about the related party issues arising from the CanWest transaction ("the September memorandum"). The September memorandum was false and fraudulent in several respects:

- The September memorandum stated that $32.4 million (Cdn. $50 million) had been allocated to the non-competition agreements. In fact, the transaction agreement had allocated $51.8 million (Cdn. $80 million) to the non-competition agreements.

- The September memorandum stated that ATKINSON and BOULTBEE had been requested to execute non-competition agreements. In fact, CanWest had not requested that ATKINSON and BOULTBEE sign non-competition agreements they had been inserted by the defendants.

- The September memorandum stated that International would be paid $2.6 million (Cdn. $4 million) for its non-competition agreement. In fact, International received nothing for its non-competition agreement..

- The September memorandum proposed that Ravelston be paid $19.4 million (Cdn. $30 million) as a "Management Agreement Break-Up Fee" (hereinafter referred to as "the break fee"). The memorandum stated that the break fee was appropriate because "Ravelston has a long term management agreement in place" with International, Ravelston had agreed to reduce its "ongoing" management fee which had the effect of increasing International's sale proceeds (because the sale proceeds were reduced by a multiple of the management fee going forward), and Ravelston had consented "to CanWest having an early termination of its management agreements." In fact, the CanWest transaction agreement did not refer in any way to a "management agreement break-up fee" – the money to be paid to Ravelston as a break fee was allocated in the transaction agreement to the non-competition

32

agreements. Moreover, Ravelston's management agreement with International was not long-term; it provided that each year International's Audit Committee would decide whether to continue with Ravelston as its source of management services. Thus, Ravelston had no right to an "ongoing" management fee that it might forego. As for CanWest's right to terminate its management agreement with Ravelston, the memorandum failed to disclose that, if CanWest did so, CanWest would have to pay Ravelston $29.1 million (Cdn. $45 million) whereas Ravelston had no right to any payment if International terminated its management agreement with Ravelston.

8.  It was further part of the scheme that, at the Audit Committee meeting on September 11, 2000, KIPNIS, in addition to not correcting the false statements and material omissions set forth in paragraph 7, made additional false statements in support of the non-competition fees and the break fee.

- ■ KIPNIS stated that CanWest had originally insisted on BLACK and Radler each receiving $16.8 million (Cdn. $26 million) for their non-competition agreements; in fact, CanWest never insisted that any non-compete covenantor receive any money.
- ■ KIPNIS stated that BLACK and Radler had negotiated so that "Cdn $12 million be reallocated [from the money that CanWest had purportedly require BLACK and Radler to receive] to cover bonuses for senior management, which reallocation would save the Company additional bonus costs." In fact, there were no negotiations with CanWest about the allocation of the non-competition fees, and senior management received their bonuses from Ravelston, not International.
- ■ KIPNIS stated that the break fee was justified because Ravelston had willingly reduced its management fees from International for the year 2000, which had the effect of increasing International's sale proceeds from CanWest. In fact, Ravelston did not reduce its management fee for the year 2000 and never contemplated doing so. Moreover, even it had, doing so would have had no impact on the amount of

33

International's sales proceeds from CanWest because the amount of Ravelston's management fee from International in 2000 was irrelevant; the sale proceeds were affected only by the amount of Ravelston's management fee from CanWest from 2001 forward.

The Audit Committee approved the non-competition fees and break fee as presented. At a meeting of the board of directors on the same day, with ATKINSON, BOULTBEE and KIPNIS present, the board approved the payments after the chairman of the Audit Committee summarized the information that had been presented to the Audit Committee, including several of the false statements set forth above.

9.    It was further part of the scheme that, on or about November 16, 2000, the CanWest transaction closed and Ravelston, BLACK, Radler, BOULTBEE and ATKINSON signed non-competition agreements and caused approximately $52.8 million (Cdn. $81.7 million) to be disbursed to themselves -- approximately $11.9 million (Cdn. $18.4 million) each to BLACK and Radler, approximately $1.3 million (Cdn. $2 million) each to BOULTBEE and ATKINSON, and approximately $26.4 million (Cdn. $40.9 million) to Ravelston. The extra million dollars (Cdn. $1.7 million) was interest to November 16, 2000 from July 30, 2000 -- the date of the transaction agreement -- which provided that CanWest would pay International interest from the date that the transaction agreement was signed. The exact amounts were distributed pursuant to the terms of a memorandum that was sent by facsimile from International's Treasurer in New York City to the bank in Toronto. Although the Audit Committee had been told that International would receive $2.6 million (Cdn. $4 million) for its non-competition agreement, it in fact received nothing. Before ATKINSON and BOULTBEE were inserted as non-compete covenantors, the transaction documents negotiated by the parties stated that the non-competition agreements were a condition of closing imposed by CanWest, which was true as to the non-competition covenantors identified at that time. After the defendants inserted ATKINSON and BOULTBEE to the list of non-competition covenantors, this language was not changed, even though the language did not apply to ATKINSON

34

and BOULTBEE. BLACK, BOULTBEE and ATKINSON knew that the transaction documents were false to the extent that they stated that CanWest had conditioned the closing on receipt of non-competition agreements from BOULTBEE and ATKINSON.

10.     It was further part of the scheme that, at a meeting of the International board of directors on December 4, 2000, BLACK discussed the CanWest transaction and failed to disclose any of the false statements and material omissions set forth in paragraphs 5 through 9. In spite of their fiduciary duties to International, BOULTBEE, ATKINSON and KIPNIS, all of whom attended the meeting, also failed to disclose any of the false statements and material omissions relating to the payments.

11.     It was further part of the scheme that, in the press release about the CanWest transaction, BLACK, BOULTBEE, ATKINSON and KIPNIS failed to disclose the payments to Ravelston, BLACK, Radler, BOULTBEE and ATKINSON. The payments also were not disclosed in International's Form 10-K or its proxy statement, both of which were filed in early 2001. In or about April 2001, an attorney for a lender, who also represented International on other matters, discovered these payments in the course of doing due diligence in connection with a proposed loan to International. The lender attorney opined that International needed to disclose these payments in a filing with the SEC.

12.     It was further part of the scheme that, following the additional scrutiny prompted by the lender attorney, BLACK, BOULTBEE, ATKINSON and KIPNIS decided to alter the paper record on which the CanWest payments were approved. The defendants sought ratification of the payments from the Audit Committee and the Board of Directors based on a memorandum, dated May 1, 2001 ("the May memorandum"). The stated purpose of the May memorandum, which was submitted to the Audit Committee and the entire Board, was to correct certain "inadvertent" inaccuracies in the information that had been provided to the Audit Committee and the Board in September 2000, and to set forth all relevant facts about those payments so that the independent directors might ratify the payments on a full and accurate record. In fact, the May memorandum,

while it corrected some of the prior falsehoods, exacerbated the fraud on the independent directors by adding new false and fraudulently misleading statements and by failing to correct many of the prior falsehoods. The May memorandum was signed by KIPNIS, but was reviewed by all defendants. The May memorandum was false and misleading as follows:

- The May memorandum stated that the September 2000 representations about the break fee for Ravelston and bonuses for senior management were "inadvertent" deviations from the CanWest transaction documents, which only referred to money allocated for non-competition agreements. In fact, the break fee justification and the bonus references were not "inadvertent." Throughout the negotiation of the CanWest transaction, BLACK, ATKINSON and BOULTBEE had contemplated that part of the non-competition consideration would be paid to Ravelston as a break fee, and that the payments to ATKINSON and BOULTBEE were bonuses.

- The May memorandum stated that "CanWest's obligation to consummate the transaction was conditional on its receipt at the closing of non-competition agreements in a prescribed form by certain parties specified by it in the Transaction Agreement," including BOULTBEE and ATKINSON, and that "[t]o satisfy this critical closing condition," BOULTBEE and ATKINSON signed non-competition agreements. In fact, CanWest did not specify that BOULTBEE and ATKINSON sign non-competition agreements. Although the transaction documents contained pre-existing language stating the agreements were a condition of closing, in fact, as defendants well knew, they had inserted BOULTBEE and ATKINSON as non-competition covenantors, and neither party had changed the pre-existing language to address that fact – CanWest because it did not care enough to do so, and the defendants because they wanted to create the false impression that the agreements signed by BOULTBEE and ATKINSON were closing conditions and that their non-competition agreements were genuine.

36

- The May memorandum stated that the "Non-Competition Consideration paid by CanWest to the individual Obligors [BLACK, Radler, BOULTBEE and ATKINSON] does not, and because it was paid by CanWest cannot, have the character of compensation to the recipients thereof contrary to a comment which so suggests in the September 11th Audit Committee meeting." In fact, the "Non-Competition Consideration" was not paid by CanWest to the individual Obligors. CanWest paid this money to International, which disbursed it to the defendants at their direction. Moreover, until BLACK, BOULTBEE and ATKINSON decided that $51.8 million (Cdn. $80 million) of the sale proceeds would be allocated to the "Non-Competition Consideration," all of the $51.8 million (Cdn. $80 million) was earmarked for International as sales proceeds for the newspapers that it was selling. Furthermore, as to ATKINSON and BOULTBEE, the payments were in fact compensation in the form of bonuses from International. Thus, International "paid" the non-competition consideration in every sense of the word.

- The May memorandum stated that "the Non-Competition Consideration was established in the Transaction Agreement and reflected the value attributed by CanWest to the Obligors' non-competition agreements." In fact, the $51.8 million (Cdn. $80 million) that was set aside for the "Non-Competition Consideration" did not reflect the value attributed by CanWest to the non-competition agreements. That amount was chosen unilaterally by the defendants and inserted into the Transaction Agreement at their request. CanWest did not object to the defendants' proposal because the allocation of a portion of the purchase price to the non-competition agreements was irrelevant to CanWest – CanWest was paying the same total amount regardless.

- The May memorandum stated that "the amount of the Non-Competition Consideration relative to the sale price of the assets sold by the Corporation to

37

CanWest, being approximately 2.5 %, is consistent with the amount of payments made for non-competition covenants in several recent asset sales by the Corporation." In fact, in recent asset sales, substantially more than 2.5 % of the sale price had been allocated to non-competition payments because BLACK, Radler, BOULTBEE and ATKINSON had decided to insert themselves as non-competition covenantors and to pay themselves non-competition fees from proceeds that otherwise would have been paid to International. Thus, for example, in the CNHI II deal (which had closed in November 2000, the same month as the CanWest transaction), the amount paid for non-competition covenants was greater than 10 % of the sale price because BLACK, Radler, BOULTBEE and ATKINSON had decided to pay themselves $9.5 million in fraudulent non-competition fees. When the defendants went back to the Audit Committee in May 2001 for ratification of CanWest payments originally approved in September 2000, they had a fiduciary obligation to disclose to the Audit Committee that in November 2000, February 2001 and April 2001, they had fraudulently obtained approximately $15 million in non-competition fees in connection with the U.S. Community asset sales. By failing to do so, defendants breached their fiduciary duties to International and the public majority shareholders.

■　The May memorandum failed to disclose: that the September memorandum had represented that International would receive $2.6 million (Cdn. $4 million) for its non-competition agreement, but in fact received nothing.

On May 1, 2001, KIPNIS sent the May memorandum by facsimile to the Chairman of International's Audit Committee in London, England. On May 4, 2001, KIPNIS and Radler spoke by telephone with the Chairman of the Audit Committee about the May memorandum and the purported "inaccuracies" in International's minutes relating to the CanWest transaction. On May 4, 2001, KIPNIS sent the May memorandum by overnight mail to the members of International's

38

Audit Committee.

13.     It was further part of the scheme that, at a meeting of International's Audit Committee on May 14, 2001, KIPNIS discussed the May memorandum. According to minutes of the meeting prepared by KIPNIS, he told that Audit Committee that: "In reviewing the minutes [relating to the September 2000 approval of the CanWest non-competition payments], we found that in a number of inadvertent respects, the minutes did not accurately reflect the CanWest transaction. All of the amounts originally considered by the Audit Committee and the Board were correct, both absolutely and relative to the size of the transaction." Both representations were false. The inaccuracies in the prior minutes were not inadvertent, and the amounts originally considered in September 2000 included $2.6 million (Cdn. $4 million) that was earmarked for International; but in the amounts ratified in May 2001, the $2.6 million (Cdn. $4 million) that was originally supposed to go to International instead went to Ravelston. Based on these oral misrepresentations and the misrepresentations in the May memorandum, the Audit Committee ratified the payment of the "Non-Competition Consideration" in the CanWest transaction to Ravelston, BLACK, Radler, BOULTBEE and ATKINSON.

14.     It was further part of the scheme, on May 14, 2001, KIPNIS prepared a memorandum for use by the Chairman of the Audit Committee when he made his report to the full Board about the Audit Committee's ratification of the CanWest payments. The memorandum was copied to ATKINSON. In the May 14, 2001 memorandum, KIPNIS repeated the falsehood that "[i]n a number of inadvertent respects, the material reviewed in connection with the September 11 Audit and Board meetings did not accurately reflect the CanWest transaction," as well as the false statement that "[a]ll of the amounts originally considered by the committee and board were correct – both absolutely and relative to the size of the transaction." At a meeting of the full Board of Directors of International on May 17, 2001, the Chairman of the Audit Committee, when discussing the proposed ratification of the CanWest payments, repeated the falsehoods that KIPNIS had provided to him. Based on these falsehoods, as well as the false statements in the May memorandum, the independent directors on

39

the full Board ratified the CanWest non-competition payments. BLACK, BOULTBEE, ATKINSON and KIPNIS attended the Board meeting. Each knew that the May memorandum was false and fraudulent, and that the independent directors had been lied to about the money that supposedly was to be paid to International, but was not. None of them corrected any of the false information that was provided to the independent directors.

## CanWest Disclosures to Shareholders

15.    It was further part of the scheme that, on or about May 15, 2001, International filed a Form 10Q with the SEC. The 10Q discussed the non-competition fees in the CanWest transaction. BLACK, BOULTBEE and ATKINSON caused the 10Q to falsely state that the non-competition agreements signed by BOULTBEE and ATKINSON were "required by CanWest as a condition of the transaction." The 10Q also failed to disclose: (1) that BLACK, BOULTBEE and ATKINSON had fraudulently diverted the money that was used to pay the non-competition fees from International to themselves; and (2) that BLACK, BOULTBEE, ATKINSON and KIPNIS had twice obtained Audit Committee and Board approval of these payments by fraud. The defendants caused a similar false and fraudulent disclosure to be included in International's 2001 Form 10-K, which was filed with the SEC in March 2002.

16.    It was further part of the scheme that, at International's annual shareholder meeting on May 23, 2002, BLACK made numerous false and fraudulent statements about the CanWest non-competition payments, as follows:

■    In response to a question expressing concern about the level of non-competition payments by International to BLACK and others, BLACK responded: "The answer is that it was in our opinion not technically speaking a reduction of the compensation paid to this company. The consideration was not reduced there by the acquirer in the principle case that you're referring to, the CanWest deal." This was false. Until BLACK, BOULTBEE and ATKINSON decided that $51.8 million (Cdn. $80 million) of the sale proceeds would be allocated to the "Non-Competition

40

Consideration," all of that money was earmarked for International as compensation for the newspapers that it was selling.

■ BLACK also stated:

And Mr. Asper [CanWest's executive chairman] demanded that there be a non-compete arrangement and effectively the independent directors of this company determined that since he wished – that it was something that he was paying valuable consideration for and some of that should come to us and not this company. And that was not a matter negotiated directly by us. And, I suppose there's room for debate here, but in all circumstances, the independent directors did what they thought was best.

This statement was false and fraudulent because: (1) CanWest did not demand that BOULTBEE and ATKINSON sign non-competition agreements; (2) the non-competition payments were not negotiated by the independent directors; BLACK, BOULTBEE and ATKINSON determined the amounts of the payments and to whom they would be made; (3) CanWest did not consider itself to be "paying valuable consideration for" the non-competition agreements; CanWest was indifferent to the amount allocated to the non-competition agreements, which was determined by BLACK, BOULTBEE and ATKINSON; (4) all, not "some," of the non-competition consideration was paid to BLACK, Radler, BOULTBEE, ATKINSON and Ravelston; none was retained by International; and (5) the approval of the independent directors was obtained by fraud.

17.     It was further part of the scheme that defendants and their co-schemers used the United States mail, commercial interstate couriers and the interstate wires to execute the scheme. For example, KIPNIS sent transaction documents to others by interstate facsimile, e-mail and commercial interstate couriers. Money was wire transferred in interstate commerce. KIPNIS sent out packages of materials to the International Audit Committee by facsimile, e-mail and commercial interstate carriers. International wired its filings to the SEC in Washington, D.C.

18.     It was further part of the scheme that defendants and their co-schemers did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden, acts done in

41

furtherance of the scheme and the purpose of those acts beyond those acts of concealment set forth above.

19.    On or about May 1, 2001, at Chicago in the Northern District of Illinois, Eastern Division,

<div align="center">

CONRAD M. BLACK,
JOHN A. BOULTBEE,
PETER Y. ATKINSON and
MARK S. KIPNIS,

</div>

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted in interstate and foreign commerce from Chicago, Illinois, to London, England, by means of wire and radio communications, certain writings, signs, and signals, namely: a facsimile of a letter and the May Memorandum;

In violation of Title 18, United States Code, Sections 1343, 1346 and 2.

## COUNT NINE

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference paragraphs 1 through 18 of Count Eight of this Indictment as though fully set forth herein.

2.     On or about May 4, 2001, at Chicago, in the Northern District of Illinois, Eastern Division,

<div align="center">
CONRAD M. BLACK,<br>
JOHN A. BOULTBEE,<br>
PETER Y. ATKINSON and<br>
MARK S. KIPNIS,
</div>

defendants herein, for the purpose of executing and attempting to execute the above-described scheme, did knowingly cause to be deposited for delivery by an interstate carrier from Chicago, Illinois, envelopes addressed to members of the International Audit Committee in New York and Washington, D.C., to be sent and delivered by an interstate carrier, namely, Federal Express, according to the directions thereon, which envelopes contained a memorandum relating to the non-competition payments in the CanWest transaction;

In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

43

**COUNT TEN**

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.     At times material herein:

a.     International leased a jet airplane that BLACK was authorized to use for company business. International also paid for entertainment expenses incurred by BLACK for the purpose of promoting International's business. In addition, International owned an apartment at 635 Park Avenue, Second Floor, New York, New York ("the Second Floor Apartment"), which BLACK was authorized to use when he was in New York City. A subsidiary purchased the Second Floor Apartment in December 1994 for $3 million. BLACK was given an option to purchase the Second Floor Apartment, including any capital improvements or furnishings of the apartment paid for by the company, at a price equal to the then aggregate fair market value thereof, payable in cash at the closing of the purchase. BLACK's use of this apartment and his option to purchase it were disclosed to International's Audit Committee.

b.     The option agreement provided that International would pay for "all closing costs and all capital improvements, decorating and furnishings needed, as agreed between BLACK and the Company, to put the Apartment into appropriate habitable condition for the uses contemplated by BLACK and the Company." In 1996, however, BLACK made plans to spend more than $2 million to, among other things: (1) reduce the number of bedrooms from six to three; and (2) decorate the apartment in lavish fashion. By this point, several significant shareholders had complained about the company spending $3 million on an apartment in New York City for use by an executive who was a Canadian citizen and, for tax reasons, could only spend a limited number of days each year in the United States. Because shareholders were complaining about the company's purchase of the apartment, BLACK and the company agreed that BLACK would pay for his proposed renovation of the apartment. This did not change the terms of the option agreement. There

44

was never any discussion about International reimbursing BLACK for this expense, or that BLACK's payment thereof created any loan from BLACK to the company. The International employee with whom BLACK reached this agreement was an executive referred to herein as "Executive B," who was the person at International who was responsible for dealing with shareholder complaints. Executive B worked out of International's office in New York City.

      c.    In January 1998, BLACK purchased the Ground Floor Apartment at 635 Park Avenue, New York, New York ("the Ground Floor Apartment"), for approximately $499,000. In 1998 and 1999, while BLACK owned the apartment, International paid more than $1.5 million for a total renovation of the Ground Floor Apartment. Among other things, the Ground Floor Apartment was converted into three distinct living spaces. BLACK's servants, among others, thereafter stayed in the Ground Floor Apartment. BLACK paid little, if anything, toward the renovation of the Ground Floor Apartment.

      d.    As a controlling shareholder, officer and director of International, BLACK had a fiduciary duty of undivided loyalty to International, which among other things, required BLACK to refrain from acting to benefit himself or anyone else at International's expense, to disclose all material facts to International's independent directors regarding any transactions involving himself and International, and to abide by the determination of such independent directors as to the fairness of the transaction.

## General Scheme Allegations

      3.    Beginning no later than in or about May 1998 and continuing thereafter until at least in or about August 2002, at Chicago, in the Northern District of Illinois, Eastern Division and elsewhere,

<div align="center">

CONRAD M. BLACK and
JOHN A. BOULTBEE,

</div>

defendants herein, along with others known and unknown to the grand jury, devised, intended to devise, and participated in a scheme to defraud International and International's public shareholders of money, property and their intangible right of honest services, and to obtain money and property

<div align="center">45</div>

from these victims by means of materially false and fraudulent pretenses, representations, promises and omissions. This scheme is further described below.

4.    It was part of the scheme that BLACK, with BOULTBEE's assistance, repeatedly abused the perquisites provided to BLACK by International for the purpose of benefitting BLACK at the expense of the corporation and its public majority shareholders. BLACK exacerbated these breaches of fiduciary duty by determining himself what the corporation would pay to him, or on his behalf, and failing to present the related party transactions between himself and the company to International's Audit Committee. As a result, BLACK fraudulently obtained millions of dollars from International, and he and BOULTBEE fraudulently deprived International of its right to receive their honest services.

### Bora Bora Vacation

5.    It was further part of the scheme that, in the summer of 2001, BLACK fraudulently caused International to pay for his use of International's corporate jet to transport himself and his wife on a personal vacation to Bora Bora in French Polynesia. BLACK and his wife left Seattle for Bora Bora on July 30, 2001, and returned to Seattle on August 8, 2001, logging a total of 23.1 hours in flight. There was little, if any, business purpose to this vacation, which cost International tens of thousands of dollars.

6.    It was further part of the scheme that BLACK failed to bring his use of International's corporate jet for his Bora Bora vacation to the attention of International's Audit Committee, thus breaching his fiduciary duty and depriving International of his honest services. Instead, BLACK took it upon himself to determine who should bear the cost of his personal use of International's corporate jet. When International's accountants sought to have him reimburse International for this cost, BLACK refused, stating in an August 2002 e-mail to ATKINSON that "[n]eedless to say, no such outcome is acceptable."

7.    It was further part of the scheme that, to conceal his breach of fiduciary duty, BLACK failed to disclose International's underwriting of his Bora Bora vacation in International's 2002

46

proxy statement. The proxy statement purported to disclose all of the compensation that BLACK received from International in 2001, including International's payment of BLACK's personal expenses, but it contained no mention of Black's personal use of International's corporate jet. As chief executive officer, BLACK signed International's 2002 proxy statement, which was filed with the SEC on April 4, 2002, by wire from Chicago.

### The Birthday Party

8.      It was further part of the scheme that, in December 2000, BLACK fraudulently caused International to pay more than $40,000 for his wife's surprise birthday party. The party occurred on December 4, 2000, at La Grenouille restaurant in New York City. The party cost approximately $62,000; related expenses included 80 dinners at $195 per person, and $13,935 for wine and champagne. The party was a social occasion with little, if any, business purpose. Yet BLACK, without any disclosure or consultation with International's Audit Committee, determined that International would pay approximately $42,000 for the party; and that he would pay only $20,000.

### The New York City Apartments

9.      It was further part of the scheme that BLACK and BOULTBEE defrauded International of millions of dollars, as well as its right to receive their honest services, in connection with International's renovation of the Ground Floor Apartment, and his purchase from International of the Second Floor Apartment.

10.      It was further part of the scheme that, starting in or about May 1998 and continuing until in or about September 1999, BLACK caused International to expend more than $1.5 million to renovate the Ground Floor Apartment, which at that time was owned by BLACK. Among other things, the Ground Floor Apartment was converted into three distinct living spaces. One of the purposes of this was to create living spaces for BLACK's servants, so that they would be proximate to the Second Floor Apartment. Indeed, one of the reasons that BLACK purchased the Ground Floor Apartment was so that his servants would have a place to live near the Second Floor Apartment. After the renovation was complete, BLACK's servants often resided in the Ground Floor Apartment

47

when BLACK was in New York City. International's directors and employees, as well as others, also stayed in the Ground Floor Apartment.

11.    It was further part of the scheme that BLACK concealed the fact that International had paid for the renovation of his Ground Floor Apartment by causing International to make false statements in its proxy statements about these payments. International's 1999 proxy statement described the Second Floor Apartment that International had purchased for BLACK's use in 1994, and then stated that International in 1998 had paid $957,722 for "building out and maintaining" that apartment. International's 2000 proxy statement again referred to the Second Floor Apartment, and stated that International in 1999 had paid $143,500 for "building out and maintaining" that apartment. In fact, the "building out" expenses referred to in both proxy statements related to the Ground Floor Apartment; there was no significant construction done on the Second Floor Apartment in 1998 or 1999. BLACK signed both proxy statements on behalf of International.

12.    It was further part of the scheme that, in or about December 2000, BLACK and BOULTBEE defrauded International of millions of dollars, as well as its right to receive their honest services, in connection with BLACK's purchase from International of the Second Floor Apartment.

13.    It was further part of the scheme that, after BLACK fraudulently obtained millions of dollars in non-competition fees from the CNHI II and CanWest transactions in November 2000, BLACK decided to purchase the Second Floor Apartment, and that the price that he would pay would be the same that the company had paid for it six years earlier -- $3 million. In order to justify that price, BLACK and BOULTBEE falsely stated to Executive B that the option agreement allowed BLACK to purchase the apartment at International's "cost."

14.    It was further part of the scheme that, a short while later, BOULTBEE telephoned Executive B and told him that BLACK would purchase the Second Floor Apartment for $3 million, suggested that this was the "market value" in light of BLACK's payment for the renovation, and directed Executive B to write a memorandum memorializing this transaction after calling Executive B's friends in real estate to confirm the $3 million amount. BOULTBEE did not explain why he had

48

earlier stated that BLACK's option was at "cost," but he was now talking about "market value" as the basis for BLACK's exercise of the option. BOULTBEE also did not explain how he and BLACK had reached the conclusion that International's beneficial interest in the Second Floor Apartment, which the company had purchased in 1994, had not appreciated at all in six years in the booming Upper East Side real estate market. Notwithstanding these facts, Executive B did as he was told because: (1) BLACK and BOULTBEE had told him that BLACK's option, notwithstanding the references to "fair market value," was at cost; (2) it was clear that BLACK did not intend to pay more than $3 million; and (3) Executive B very much wanted the proposed transaction to go forward because it would result in some money going back to the company and would defuse the shareholder complaints about the apartment, which had continued over the years.

15.     It was further part of the scheme that, a short time later, BOULTBEE told Executive B that BLACK would pay the $3 million for the Second Floor Apartment by tendering to the company $2,150,000 in cash, along with BLACK's interest in the Ground Floor Apartment, which BOULTBEE said had a fair market value of $850,000. BOULTBEE did not explain this valuation, or the inconsistency between the lack of appreciation of International's interest in the Second Floor Apartment and the sizable appreciation attributed to BLACK's interest in the Ground Floor Apartment.

16.     It was further part of the scheme that Executive B thereafter had brief, superficial conversations with some New York City real estate specialists and then wrote a memorandum to KIPNIS which stated:

> After in-depth discussions with various New York City real estate specialists and meetings with Jack Boultbee, it has been agreed that the fair market value of Apartment 2, at the above address, is US $3,000,000. The fair market of the Ground Floor apartment at the same address is US $850,000.

The memorandum was false in that: (1) Executive B's conversations with the real estate specialists in fact were brief and superficial; (2) the fair market value of International's interest in the Second Floor Apartment substantially exceeded $3 million; and (3) there was no basis for claim that the fair market value of BLACK's interest in the Ground Floor Apartment was $850,000, other than

49

BOULTBEE's unsubstantiated representation to that effect. As directed, Executive B sent a copy of the memorandum to BOULTBEE. An attorney prepared a transfer agreement called an "Instrument of Transfer and Declaration of Trust," that was dated as of December 29, 2000.

17.　　It was further part of the scheme that, on or about January 23, 2001, BLACK and International, by Executive B, signed the "Instrument of Transfer and Declaration of Trust," pursuant to which BLACK acquired International's interest in the Second Floor Apartment for $3,000,000. In this document, BLACK and Executive B "agreed" that "the fair market value" of International's "beneficial interest" in the Second Floor Apartment was $3,000,000. The document provided that BLACK would pay this amount by tendering $2,150,000 in cash to International, and by transferring to International the beneficial interest in the Ground Floor Apartment, which BLACK and Executive B "agreed" had a "fair market value" of $850,000.

18.　　It was further part of the scheme that the "agreed" fair market value for the Second Floor Apartment was a sham. In addition to the substantial increase in property values between 1994 and 2000, International had spent during that time period more than $400,000 on capital improvements for the Second Floor Apartment. Regardless of how much of his own money BLACK spent on the Second Floor Apartment, International's beneficial interest in the apartment was worth substantially more than $3,000,000 in December 2000.

19.　　It was further part of the scheme that BLACK's payment to International for the Second Floor Apartment also involved fraud. The $2,150,000 that BLACK paid in cash was funded by his non-competition fees from the CNHI II and CanWest transactions, which BLACK had obtained in November 2000 by fraud, as set forth in Counts One through Nine. BLACK wire transferred the $2,150,000 to International on or about December 22, 2000. In addition, the 70 % increase in the fair market value ascribed to BLACK's beneficial interest in the Ground Floor Apartment (where International had paid more than $1.5 million for improvements) was inconsistent with the 0 % increase ascribed to International's beneficial interest in the Second Floor Apartment (where BLACK had spent substantial sums on renovation).

20.     It was further part of the scheme that BLACK breached his fiduciary duty by not bringing the December 2000 transaction before the International Audit Committee for its approval. The option agreement required that BLACK pay the company "fair market value" and cash consideration for Second Floor Apartment. BLACK did neither – he paid International only its initial cost, and his purchase payment included the transfer to International of the Ground Floor Apartment. Moreover, both apartments had been substantially renovated since they had been purchased, with International paying for the renovations to the Ground Floor Apartment that had been owned by BLACK, and BLACK paying for improvements to the Second Floor Apartment that had been owned by the company. Under these circumstances, in order for BLACK to purchase the Second Floor Apartment in December 2000 under the terms proposed, BLACK's fiduciary duties required that he disclose all material facts regarding his proposed purchase to International's independent directors, and to abide by their determination as to the fairness of the transaction. BLACK failed to do so; the material facts regarding his December 2000 purchase of the Second Floor Apartment were not presented to the independent directors of International. By so acting, BLACK breached his fiduciary duties to International and its public, majority shareholders, and fraudulently deprived them of his honest services.

21.     It was further part of the scheme that BLACK concealed his fraud in connection with the December 2000 transaction by causing International to omit material facts regarding the transaction in its 2001 proxy statement. The proxy statement was submitted to the SEC by wire from Chicago to Washington, D.C., on or about March 27, 2001. With respect to BLACK's option to purchase the Second Floor Apartment, the proxy statement stated that International previously had granted to BLACK an option to acquire at any time International's interest in the Second Floor Apartment, at its "then fair market value[]. . . . Effective December 29, 2000, Mr. Black exercised his option to purchase." The proxy statement was fraudulent in that it failed to disclose that BLACK had not paid "fair market value" for the Second Floor Apartment, that he had not paid cash consideration as required by the option agreement, and that he had not obtained the required, fully-

51

informed approval of this transaction from the independent directors of International. This same fraudulent statement was repeated in International's 2002 proxy statement, which was filed with the SEC on or about April 4, 2002. BLACK signed the proxy statements on behalf of International, and BOULTBEE reviewed them before they were filed with the SEC.

22.    It was further part of the scheme that, after International acquired the Ground Floor Apartment in December 2000, BLACK caused his servants to stay there, rent-free, on multiple occasions. As with his other breaches of fiduciary duty regarding the apartments, this abuse was not disclosed to the International Audit Committee or in International's proxy statements.

23.    It was further part of the scheme that defendants and their co-schemers did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden, acts done in furtherance of the scheme and the purpose of those acts beyond those acts of concealment set forth above.

24.    On or about March 27, 2001, at Chicago in the Northern District of Illinois, Eastern Division,

<div style="text-align:center">

CONRAD M. BLACK and
JOHN A. BOULTBEE,

</div>

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted in interstate commerce from Chicago, Illinois, to Washington, D.C., by means of wire and radio communications, certain writings, signs, and signals, namely: International's proxy statement for 2001, which was filed by wire with the SEC;

In violation of Title 18, United States Code, Sections 1343, 1346 and 2.

## COUNT ELEVEN

The UNITED STATES ATTORNEY further charges:

1.    The United States Attorney realleges and incorporates by reference paragraphs 1 through 23 of Count Ten of this Indictment as though fully set forth herein.

2.    On or about April 4, 2002, at Chicago in the Northern District of Illinois, Eastern Division,

<div style="text-align:center">

CONRAD M. BLACK and
JOHN A. BOULTBEE,

</div>

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted in interstate commerce from Chicago, Illinois, to Washington, D.C., by means of wire and radio communications, certain writings, signs, and signals, namely: International's proxy statement for 2002, which was filed by wire with the SEC;

In violation of Title 18, United States Code, Sections 1343, 1346 and 2.

## COUNT TWELVE

The UNITED STATES ATTORNEY further charges:

1.    The United States Attorney realleges and incorporates by reference paragraphs 1 through 23 of Count Ten of this Indictment as though fully set forth herein.

2.    On or about December 22, 2000, at Chicago in the Northern District of Illinois, Eastern Division,

<div align="center">
CONRAD M. BLACK and<br>
JOHN A. BOULTBEE,
</div>

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted in interstate commerce from Toronto, Canada, to Chicago, Illinois, by means of wire and radio communications, certain writings, signs, and signals, namely: a wire transfer of $2,150,000 from an account controlled by BLACK at Canadian Imperial Bank of Commerce ("CIBC") in Toronto to International's account at Bank One in Chicago, which was part of BLACK's payment for the Second Floor Apartment;

In violation of Title 18, United States Code, Sections 1343, 1346 and 2.

## COUNT THIRTEEN

The UNITED STATES ATTORNEY further charges:

1.    The United States Attorney realleges and incorporates by reference paragraphs 1 and 2 of Count Five and paragraphs 1 through 18 of Count Eight of this Indictment as though fully set forth herein.

2.    On or about December 22, 2000, at Chicago in the Northern District of Illinois, Eastern Division,

### CONRAD M. BLACK,

defendant herein, knowingly engaged and attempted to engage in a monetary transaction affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the wire transfer of $2,150,000 from an account controlled by BLACK at CIBC in Toronto to International's account at Bank One in Chicago, such property having been derived from a specified unlawful activity, namely the use of an interstate carrier for the purpose of executing and attempting to execute a scheme to defraud and to obtain money and property in connection with the CNHI II transaction in violation of Title 18, United States Code, Section 1341, and the use of a wire transmission in interstate and foreign commerce for the purpose of executing a scheme to defraud and to obtain money and property in connection with the CanWest transaction in violation of Title 18, United States Code, Section 1343;

In violation of Title 18, United States Code, Section 1957.

## COUNT FOURTEEN

The UNITED STATES ATTORNEY further charges:

1.    The United States Attorney realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.    At times material herein:

a.    Inc. and Ravelston were Canadian corporations with their principal offices located at 10 Toronto Street, in Toronto, Canada (" the 10 Toronto Street offices"). BLACK, as Chief Executive Officer and Chairman of the Board of Directors of Inc. and Ravelston maintained his principal office at the 10 Toronto Street offices.

b.    On or about November 18, 2003, the Staff of the Division of Enforcement of the United States Securities and Exchange Commission (the "SEC") advised counsel for BLACK in writing that the SEC was conducting an investigation regarding International. Additionally, on or about November 18, 2003, the SEC served counsel for BLACK with the first of several subpoenas for documents requesting:

"Any and all documents relating to the payment of fees, including management and noncompete fees, from Hollinger to or for the benefit of any personnel of Hollinger or its affiliates, including, but not limited to, Conrad Black, David Radler, Mark Kipnis, Peter Atkinson, Jack Boultbee and to or for the benefit of any entities, including, but not limited to, Ravelston Corp., Horizon Publications, Inc. and Bradford."

c.    On or about August 27, 2004, the SEC notified BLACK in writing that it intended to recommend a civil injunctive action against BLACK for violations of Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934, Rules 10b-5 and 13b2-1 thereunder, and, as a control person of the Company, Sections 13(a) and 13(b) of the 1934 Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, relating to, among other things, "the transfer of Hollinger International, Inc. assets including, but not limited to, purported non-competition payments and sales of newspapers."

d.    On or about October 13, 2004, pursuant to an application made by Catalyst Fund General Partner I Inc. ("Catalyst"), an Inspector was appointed for Inc. by the Superior Court of Justice in Ontario, Canada (the "Canadian court"), pursuant to the provisions of section 229 of

56

the Canadian Business Corporations Act, R.S.C. 1985 c. C-44 (the "CBCA") to investigate the affairs of Inc. The Inspector was directed by the Canadian court to investigate several areas, including but not limited to, related party transactions between Inc. and related parties, and non-compete payments received by Inc. and Inc.'s Senior Management, including BLACK, Radler, Boultbee and Atkinson.

      e.     On or about December 17, 2004, the Canadian court ordered that:

> No documents of Inc. wherever situated or documents of Related Parties [including BLACK, Radler, Boultbee and Atkinson] which are pertinent to Inc. shall be destroyed without further Order of this Court. No documents currently resident at 10 Toronto Street shall be removed, altered or destroyed without the consent in writing of the Inspector or further Order of this Court.

      f.     On or about November 15, 2004, the SEC filed a Complaint for Permanent Injunction and Other Equitable Relief against CONRAD BLACK and others (the "SEC proceeding"). The SEC's Complaint alleged that BLACK engaged in a fraudulent and deceptive scheme to divert money from International "through a series of related-party transactions involving, among other things, purported 'non-compete payments. . ..'" An amended complaint was filed on March 10, 2005.

      g.     On or about March 21, 2005, the United States Attorney's Office for the Northern District of Illinois (the "government") filed a motion to intervene, for a limited, temporary stay of discovery in the SEC proceeding. In the motion, which was served on BLACK's counsel, the government declared:

> The United States Attorney's Office for the Northern District of Illinois [] is conducting a criminal investigation of Black, Radler, Hollinger, Inc. (collectively, 'the SEC defendants') and others relating to their conduct as to Hollinger International. The criminal investigation seeks to determine whether the SEC defendants and others fraudulently diverted corporate assets and opportunities owned by Hollinger International to themselves and to companies that they controlled. The transactions under investigation include various purported 'non-competition payments' that were made to Black, Radler, Hollinger, Inc. and others in connection with Hollinger International's sale of newspaper publications to third parties. The criminal investigation also seeks to determine whether fraud occurred in connection with Hollinger International's sale of newspaper publications to companies controlled by Black and Radler, as well as other transactions between Hollinger International and the SEC defendants and their companies. In connection with each of these related party transactions, the criminal investigation seeks to determine whether the

transaction was appropriately disclosed to Hollinger International's independent directors, in Hollinger International's SEC filings, and during Hollinger International's shareholder meetings.

The government further advised:

The government's criminal investigation seeks to determine whether the SEC defendants and others have violated various federal criminal statutes, including, but not limited to, Title 18, United States Code, Section 371 (conspiracy), 1341 (mail fraud), 1343 (wire fraud) and 2314 (interstate transportation of funds obtained by fraud), and Title 15, United States Code, Sections 77c(a), 77e(c), 77q(a), and 78j(b), and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud).

h.     On or about April 20, 2005, the government's motion to intervene in the SEC Proceeding was granted.

i.     As part of the SEC proceeding, on or about March 29, 2005, the SEC served its "First Request for Production of Documents" to Inc. The SEC requested, among other things, "All documents relating to any matters that are the subject of the allegations contained in the [SEC's] Complaint." The SEC's March 29, 2005 document request was served on counsel for BLACK, and others.

j.     On or about May 19, 2005, Senior Trial Counsel for the SEC advised counsel for BLACK via telephone that the SEC would be serving a request for production of documents to BLACK shortly. The May 19, 2005 telephone call with BLACK's counsel was followed by a letter sent later that day, via facsimile and Federal Express, to BLACK's counsel confirming that the SEC would be serving a request for production of documents to BLACK shortly.

k.     As part of the SEC proceeding, on or about May 20, 2005, the SEC served its "First Request for Production of Documents" to BLACK. The SEC requested, among other things, "All documents relating to any matters that are the subject of the allegations contained in the [SEC's] Complaint." The SEC's May 20, 2005 document request was served on counsel for BLACK, and others.

l.     On or about May 20, 2005, at approximately 2:08 p.m. E.S.T., an assistant to BLACK requested that security personnel at the 10 Toronto Street offices assist her in removing approximately 13 boxes to her vehicle in the rear parking area of the 10 Toronto Street offices. As

the boxes were being moved by security personnel, a representative of Inc. advised the Inspector that BLACK was planning to remove boxes of documents from the 10 Toronto Street offices. Upon learning of BLACK's attempt to remove documents from the 10 Toronto Street offices, security personnel were advised by the Inspector of the December 17, 2004 Canadian court order regarding the removal of documents. Subsequently, all of the boxes were returned by security personnel to the inside of the 10 Toronto Street offices.

   m. On or about May 20, 2005, at approximately 5:11 p.m. E.S.T., BLACK, his chauffeur and his assistant returned to the 10 Toronto Street offices and loaded the approximately 13 boxes of documents (which BLACK had attempted to have removed earlier in the day) from inside the 10 Toronto Street offices through a rear entrance and into BLACK's vehicle. BLACK's vehicle was then driven away by his chauffeur with the boxes of documents inside.

   3. On or about May 20, 2005, at Chicago, in the Northern District of Illinois, Eastern Division,

<div align="center">CONRAD M. BLACK,</div>

defendant herein, corruptly concealed, and attempted to conceal, records, documents, and other objects with the intent to impair their availability for use in official proceedings, namely the SEC proceeding against BLACK, the criminal investigation of BLACK by a Federal grand jury and the pending criminal proceeding against BLACK before a judge and court of the United States;

   In violation of Title 18, United States Code, Sections 1512(c)(1) and 2.

<div align="center">59</div>

## COUNT FIFTEEN

The UNITED STATES ATTORNEY further charges:

### The Enterprise

1.     Defendant CONRAD M. BLACK, F. David Radler, John A. Boultbee, Peter Y. Atkinson, Mark S. Kipnis, Inc. and Ravelston constituted an association-in-fact enterprise (the "Hollinger Enterprise") within the meaning of Title 18, United States Code, Section 1961(4). The Hollinger Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The Hollinger Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

2.     Defendant CONRAD M. BLACK, as the controlling shareholder, Chief Executive Officer, and Chairman of the Board of Directors of International, Inc. and Ravelston, was the principal leader, manager and organizer of the Hollinger Enterprise. F. David Radler, who was the chief manager of International's United States newspapers, was involved in business decisionmaking relating to the purchases and sales of those newspapers. John A. Boultbee, who was a Chartered Accountant in Canada, functioned as BLACK's chief financial advisor, and was the architect of the Hollinger Enterprise's tax frauds. Peter Y. Atkinson, who was a licensed attorney in Canada, functioned as BLACK's chief legal advisor. Mark S. Kipnis, who was a licensed attorney in Illinois and was the secretary for the Board of Directors and Audit Committee of International, implemented the directives of BLACK and his associates.

### Purposes of the Enterprise

3.     The purposes of the Hollinger Enterprise included the following:

a.     Enriching BLACK, his associates, and their entities at the expense of International and its public, majority shareholders through, among other things, mail fraud, wire fraud, and interstate transportation of money taken by fraud.

b.     Depriving International and its public, majority shareholders of their right to receive honest services through, among other things, mail fraud and wire fraud.

c.     Promoting and maintaining BLACK's control over the Hollinger Enterprise's affairs.

d.     Enriching BLACK, his associates and their entities at the potential expense of the tax authorities of Canada through, among other things, mail and wire fraud.

e.     Concealing the fraudulent activities of, and the fraud proceeds received by, BLACK, his associates and their entities.

### Means and Methods

4.     The means and methods by which BLACK and his associates conducted and participated in the conduct of the affairs of the Hollinger Enterprise included the following:

a.     BLACK and his associates fraudulently deprived International of money and honest services by inserting themselves and their entities as non-competition covenantors and recipients of non-competition fees, without disclosing their misconduct to International's Audit Committee.

b.     BLACK and his associates fraudulently deprived International of money and honest services by inserting themselves and their entities as non-competition covenantors and recipients of non-competition fees, and making false statements and material omissions about the payments to International's Audit Committee.

c.     BLACK and his associates fraudulently labeled bonuses paid by International as non-competition fees in order to gain favorable tax treatment in Canada.

d.     BLACK, with the assistance of Boultbee and other associates, fraudulently abused the perquisites that International had provided to BLACK – to the benefit of BLACK and the detriment of International – and failed to disclose BLACK's misconduct to International's Audit Committee, thereby depriving International of money and honest services.

e.     BLACK and his associates concealed their fraudulent conduct by, among other things, causing International to make filings with the SEC that contained material falsehoods and omissions, by making false and fraudulent statements to International's shareholders and other

outsiders.

f.     The United States Attorney realleges and incorporates by reference the following paragraphs of this Indictment as though fully set forth herein: (a) paragraphs 1-33 of Count One; (b) paragraphs 1-18 of Count Eight; and (c) paragraphs 1-23 of Count Ten.

### The Racketeering Violation

5.     From in or about 1998 and continuing through in or about August 2002, at Chicago in the Northern District of Illinois, Eastern Division, and elsewhere,

### CONRAD M. BLACK,

defendant herein, together with F. David Radler, John A. Boultbee, Peter Y. Atkinson, Mark S. Kipnis, Inc., Ravelston and others known and unknown to the grand jury, being persons employed by and associated with the Hollinger Enterprise, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did conduct and participate, directly and indirectly, in the conduct of the affairs of Hollinger Enterprise through a pattern of racketeering activity set forth below.

### The Pattern of Racketeering Activity

6.     The pattern of racketeering activity, as defined in Title 18, United States Code, Section 1961(1) and 1961(5), consisted of the following acts:

### Racketeering Act One: Interstate Transportation of Money Taken By Fraud
### U.S. Community Sales – CNHI I

7.     Defendant BLACK committed Racketeering Act One as follows: On or about February 1, 1999, in the State of New York, and elsewhere, defendant BLACK caused to be transported, transmitted and transferred in interstate and foreign commerce money of the value of $5,000 or more, knowing the same to have been taken by fraud; namely $12,000,000 relating to the CNHI I non-competition agreement that was transferred from CNHI to a bank in New York, New York for credit to Inc.'s bank account in Toronto, Canada, in violation of Title 18, United States Code, Sections 2314 and 2.

## Racketeering Act Two: Interstate Transportation of Money Taken By Fraud
## U.S. Community Sales – Horizon

8.      Defendant BLACK committed Racketeering Act Two as follows: On or about August 9, 1999, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant BLACK caused to be transported, transmitted and transferred in interstate and foreign commerce money of the value of $5,000 or more, knowing the same to have been taken by fraud; namely $1,200,000 relating to the Horizon non-competition agreement that was transferred from Horizon in Chicago, Illinois to Inc. in Toronto, Canada, in violation of Title 18, United States Code, Sections 2314 and 2.

## Racketeering Act Three: Interstate Transportation of Money Taken By Fraud/Mail Fraud
## U.S. Community Sales – Forum and Paxton

9.      Defendant BLACK committed the following acts, any one of which constitutes Racketeering Act Three:

a.      On or about September 30, 2000, in the State of New York and elsewhere, defendant BLACK caused to be transported, transmitted and transferred in interstate and foreign commerce money of the value of $5,000 or more, knowing the same to have been taken by fraud; namely $100,000 relating to the Forum non-competition agreement that was transferred from Forum to a bank in New York, New York for credit to Inc.'s bank account in Toronto, Canada, in violation of Title 18, United States Code, Sections 2314 and 2.

b.      On or about October 2, 2000, in the State of New York and elsewhere, defendant BLACK caused to be transported, transmitted and transferred in interstate and foreign commerce money of the value of $5,000 or more, knowing the same to have been taken by fraud; namely $500,000 relating to the Paxton non-competition agreement that was transferred from Paxton to a bank in New York, New York for credit to Inc.'s bank account in Toronto, Canada, in violation of Title 18, United States Code, Sections 2314 and 2.

c.      On or about April 9, 2001, at Chicago, in the Northern District of Illinois,

63

Eastern Division, and elsewhere, defendant BLACK, for the purpose of executing and attempting to execute the scheme described in paragraphs 1 through 33 of Count One of this indictment, did knowingly cause to be deposited for delivery by an interstate carrier an envelope addressed to Kipnis, to be sent and delivered by an interstate carrier, according to the directions thereon, which envelope contained "non-competition payments" in the form of checks totaling $600,000, in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## Racketeering Act Four: Interstate Transportation of Money Taken By Fraud/Mail Fraud U.S. Community Sales – CNHI II

10.     Defendant BLACK committed the following acts, any one of which alone constitutes Racketeering Act Four:

a.     On or about November 1, 2000, in the State of New York and elsewhere, defendant BLACK caused to be transported, transmitted and transferred in interstate and foreign commerce money of the value of $5,000 or more, knowing the same to have been taken by fraud; namely $750,000 relating to the CNHI II non-competition agreement that was transferred from CNHI to a bank in New York, New York for credit to Inc.'s bank account in Toronto, Canada, in violation of Title 18, United States Code, Sections 2314 and 2.

b.     On or about November 21, 2000, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant BLACK, for the purpose of executing and attempting to execute the scheme described in paragraphs 1 through 33 of Count One of this indictment, did knowingly cause to be deposited for delivery by an interstate carrier an envelope addressed to Mark S. Kipnis, to be sent and delivered by an interstate carrier, according to the directions thereon, which envelope contained a "non-competition" payment in the form of a check made payable to Radler in the amount of $4,300,000, in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

c.     On or about November 21, 2000, in the State of Illinois, and elsewhere, defendant BLACK, for the purpose of executing and attempting to execute the scheme described in paragraphs 1 through 33 of Count One of this indictment, did knowingly cause to be deposited for

delivery by an interstate carrier an envelope addressed to Peter Y. Atkinson, to be sent and delivered by an interstate carrier, according to the directions thereon, which envelope contained "non-competition" payments in the form of a check made payable to BLACK in the amount of $4,300,000, Boultbee in the amount of $450,000, and Atkinson in the amount of $450,000, in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

### Racketeering Act Five: Mail Fraud

### U.S. Community Sales – American Publishing Company

11.     Defendant BLACK committed the following acts, any one of which alone constitutes Racketeering Act Five:

a.     On or about February 8, 2001, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant BLACK, for the purpose of executing and attempting to execute the scheme described in paragraphs 1 through 33 of Count One of this indictment, did knowingly cause to be deposited for delivery by an interstate carrier from Chicago, Illinois, an envelope addressed to Atkinson in Toronto, Canada, to be sent and delivered by an interstate carrier, namely, Federal Express, according to the directions thereon, which envelope contained Noncompetition Agreements with American Publishing Company to be executed by certain International officers, and approximately $2.9 million in checks as consideration for those agreements, in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

b.     On or about March 1, 2001, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant BLACK, for the purpose of executing and attempting to execute the scheme described in paragraphs 1 through 33 of Count One of this indictment, did knowingly cause to be deposited for delivery by an interstate carrier an envelope addressed to Kipnis, to be sent and delivered by an interstate carrier, according to the directions thereon, which envelope contained Non-Competition Agreements with American Publishing Company executed by certain International officers, in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

65

## Racketeering Act Six: Wire Fraud/Mail Fraud

### Canadian Sales – CanWest

12.   Defendant BLACK committed the following acts, any one of which alone constitutes Racketeering Act Six:

a.   On or about November 16, 2000, in the State of New York and elsewhere, defendant BLACK, for the purpose of executing the scheme described in paragraphs 1 through 18 of Count Eight of this indictment, did knowingly cause to be transmitted in interstate and foreign commerce from New York, New York, to Toronto, Canada, by means of wire and radio communications, certain writings, signs, and signals, namely: a facsimile of a memorandum regarding the distribution of the CanWest non-competition consideration, in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

b.   On or about May 1, 2001, at Chicago, in the Northern District of Illinois, Eastern Division, defendant BLACK, for the purpose of executing the scheme described in paragraphs 1 through 18 of Count Eight of this indictment, did knowingly cause to be transmitted in interstate and foreign commerce from Chicago, Illinois, to London, England, by means of wire and radio communications, certain writings, signs, and signals, namely: a facsimile of a letter and the May memorandum, in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

c.   On or about May 4, 2001, at Chicago, in the Northern District of Illinois, Eastern Division, defendant BLACK, for the purpose of executing and attempting to execute the scheme described in paragraphs 1 through 18 of Count Eight of this indictment, did knowingly cause to be deposited for delivery by an interstate carrier from Chicago, Illinois, envelopes addressed to members of the International Audit Committee in New York and Washington, D.C., to be sent and delivered by an interstate carrier, namely, Federal Express, according to the directions thereon, which envelopes contained a memorandum relating to the non-competition payments in the CanWest transaction, in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

**Racketeering Act Seven: Wire Fraud**

**Perquisites**

13. Defendant BLACK committed the following acts, any one of which alone constitutes Racketeering Act Seven:

a. On or about December 22, 2000, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant BLACK, for the purpose of executing the scheme described in paragraphs 1 through 23 of Count Ten of this indictment, did knowingly cause to be transmitted in interstate and foreign commerce from Toronto, Canada, to Chicago, Illinois, by means of wire and radio communications, certain writings, signs, and signals, namely: a wire transfer of $2,150,000 from an account controlled by BLACK at CIBC in Toronto to International's account at Bank One in Chicago, in connection with BLACK's purchase of the Second Floor Apartment, in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

b. On or about March 27, 2001, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant BLACK, for the purpose of executing the scheme described in paragraphs 1 through 23 of Count Ten of this indictment, did knowingly cause to be transmitted in interstate commerce from Chicago, Illinois, to Washington, D.C., by means of wire and radio communications, certain writings, signs, and signals, namely: International's proxy statement for 2001, which was filed by wire with the SEC, in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

c. On or about April 4, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant BLACK, for the purpose of executing the scheme described in paragraphs 1 through 23 of Count Ten of this indictment, did knowingly cause to be transmitted in interstate commerce from Chicago, Illinois, to Washington, D.C., by means of wire and radio communications, certain writings, signs, and signals, namely: International's proxy statement for 2002, which was filed by wire with the SEC, in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

All in violation of Title 18, United States Code, Section 1962(c).

## COUNT SIXTEEN

The UNITED STATES ATTORNEY further charges:

1. The United States Attorney realleges and incorporates by reference paragraphs 1 through 33 of Count One of this Indictment as though fully set forth herein.

2. At times material herein:

    a. International was required to pay federal corporate income taxes in the United States.

    b. International retained a tax preparer to prepare federal corporate tax returns (Form 1120), to report receipts, expenses and total income for International.

    c. Defendants, as executives of International and agents of Ravelston, were responsible for maintaining accurate books and records.

    d. Throughout 1999, defendants received various sums of cash from transactions, in the aggregate amount of approximately $13 Million, and, caused those amounts to be deposited into accounts other than accounts controlled by International. Defendants' actions caused International to not correctly report the noncompete payments in 1999.

    e. Defendants caused the tax preparer to prepare a false income tax return that failed to include the diverted cash receipts.

2. On or about September 15, 2000, in the Northern District of Illinois, Eastern Division,

> CONRAD M. BLACK,
> JOHN A. BOULTBEE
> PETER Y. ATKINSON, and
> MARK S. KIPNIS

defendants herein, willfully procured and assisted in the preparation of a false and fraudulent United States Corporation Income Tax Return (Form 1120) and accompanying Schedules, on behalf of International, for the calendar year 1999.

3. Defendants did not believe that the 1999 federal corporate income tax return was true and correct as to every material matter, in that it was stated in that return, line 11, that the total income of International was approximately $394 Million when, in fact, as defendants well knew, total income materially exceeded that amount and included gross receipts of approximately $13

Million, which was not reported on the corporate return;

In violation of Title 26, United States Code, Section 7206(2).

## COUNT SEVENTEEN

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference paragraphs 1 through 33 of Count One of this Indictment as though fully set forth herein.

2.     At times material herein:

a.     International was required to pay federal corporate income taxes in the United States.

b.     International retained a tax preparer to prepare federal corporate tax returns (Form 1120), to report receipts, expenses and total income for International.

c.     Defendants, as executives of International and agents of Ravelston, were responsible for maintaining accurate books and records.

d.     Throughout 2000 defendants received various sums of cash from transactions, in the aggregate amount of approximately $16 Million, and, caused those to be deposited into accounts other than accounts controlled by International. Defendants' actions caused International to not correctly report the noncompete payments in 2000.

e.     Defendants caused the tax preparer to prepare a false income tax return that failed to include the diverted cash receipts.

2.     On or about October 26, 2001, in the Northern District of Illinois, Eastern Division,

> CONRAD M. BLACK,
> JOHN A. BOULTBEE
> PETER Y. ATKINSON, and
> MARK S. KIPNIS

defendants herein, willfully procured and assisted in the preparation of a false and fraudulent United States Corporation Income Tax Return (Form 1120) and accompanying Schedules, on behalf of International, for the calendar year 1999.

3.     Defendants did not believe that the 2000 federal corporate income tax return was true and correct as to every material matter, in that it was stated in that return, line 11, that the total income of International was approximately $383 Million when, in fact, as defendants well knew, total income materially exceeded that amount and included gross receipts of at least $16 Million,

which was not reported on the corporate return;

In violation of Title 26, United States Code, Section 7206(2).

## FORFEITURE ALLEGATION ONE

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference Counts One through Seven of this Indictment as though fully set forth herein. Notice is hereby given, pursuant to Federal Rule of Criminal Procedure 32.2, that the United States will seek forfeiture as part of any sentence imposed in connection with a conviction on Counts One through Seven.

2.     Beginning no later than in or about January 1999, and continuing thereafter until in or about May 2001, in the Northern District of Illinois, Eastern Division, and elsewhere,

> CONRAD M. BLACK,
> JOHN A. BOULTBEE,
> PETER Y. ATKINSON and
> MARK S. KIPNIS,

defendants herein, did engage in violations of Title 18, United States Code, Sections 1341 and 1343, thereby subjecting to forfeiture to the United States, pursuant to Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(1)(C), all property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as the result of such violations, namely $32,000,000, including but not limited to:

     a.    $8,558,035, which represents the net proceeds from BLACK's sale of the Second Floor Apartment that was seized by the United States in October 2005;

     b.    BLACK's residence at 1930 S. Ocean Boulevard in Palm Beach, Florida, both of which are pledged to secure BLACK's bond in this case;

     c.    $2,620,746.69 that represents BLACK's purchase of a 26 carat diamond ring from Graff Diamonds Limited purchased on or about November 21, 2000; and

     d.    $604,435 that represents BLACK's purchase of an antique pearl and diamond bow brooch from S.J. Phillips Ltd. on or about November 21, 2000.

3.     Pursuant to Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p), if any of the property described above as being subject to forfeiture, as a result

of any act or omission of the defendants, either:

- cannot be located upon the exercise of due diligence;
- has been transferred or sold to, or deposited with, a third party;
- has been placed beyond the jurisdiction of the Court;
- has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property belonging to the defendants up to the value of the above forfeitable property, including but not limited to the following:

    a.    ATKINSON's residence at 3101 Redwood Road, Napa, California, which is pledged to secure ATKINSON's bond in this case.

## FORFEITURE ALLEGATION TWO

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference Counts Eight and Nine of this Indictment as though fully set forth herein.  Notice is hereby given, pursuant to Federal Rule of Criminal Procedure 32.2, that the United States will seek forfeiture as part of any sentence imposed in connection with a conviction on Counts Eight and Nine.

2.     Beginning no later than in or about May 2000, and continuing thereafter until in or about May 2002, in the Northern District of Illinois, Eastern Division, and elsewhere,

<div style="text-align:center">

CONRAD M. BLACK,
JOHN A. BOULTBEE,
PETER Y. ATKINSON and
MARK S. KIPNIS,

</div>

defendants herein, did engage in violations of Title 18, United States Code, Sections 1341 and 1343, thereby subjecting to forfeiture to the United States, pursuant to Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(1)(C), all property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as the result of such violations, namely $52,800,000, including but not limited to:

   a.   $8,558,035, which represents the net proceeds from BLACK's sale of the Second Floor Apartment that was seized by the United States in October 2005;

   b.   BLACK's residence at 1930 S. Ocean Boulevard in Palm Beach, Florida, both of which are pledged to secure BLACK's bond in this case;

   c.   $2,620,746.69 that represents BLACK's purchase of a 26 carat diamond ring from Graff Diamonds Limited purchased on or about November 21, 2000; and

   d.   $604,435 that represents BLACK's purchase of an antique pearl and diamond bow brooch from S.J.Phillips Ltd. on or about November 21, 2000.

3.     Pursuant to Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p), if any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants, either:

<div style="text-align:center">74</div>

- cannot be located upon the exercise of due diligence;
- has been transferred or sold to, or deposited with, a third party;
- has been placed beyond the jurisdiction of the Court;
- has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property belonging to the defendants up to the value of the above forfeitable property, including but not limited to the following:

    a.    ATKINSON's residence at 3101 Redwood Road, Napa, California, which is pledged to secure ATKINSON's bond in this case.

## FORFEITURE ALLEGATION THREE

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference Counts Ten through Twelve of this Indictment as though fully set forth herein.  Notice is hereby given, pursuant to Federal Rule of Criminal Procedure 32.2, that the United States will seek forfeiture as part of any sentence imposed in connection with a conviction on Counts Ten through Twelve.

2.     Beginning no later than in or about May 1998, and continuing thereafter until in or about August 2002, in the Northern District of Illinois, Eastern Division, and elsewhere,

<div align="center">

CONRAD M. BLACK and<br>
JOHN A. BOULTBEE,

</div>

defendants herein, did engage in violations of Title 18, United States Code, Section 1343, thereby subjecting to forfeiture to the United States, pursuant to Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(1)(C), all property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as the result of such violations, including but not limited to:

        a.     At least $8,558,035, which represents the net proceeds from BLACK's sale of the Second Floor Apartment that was seized by the United States in October 2005, which is pledged to secure BLACK's bond in this case;

        b     $2,620,746.69 that represents BLACK's purchase of a 26 carat diamond ring from Graff Diamonds Limited purchased on or about November 21, 2000; and

        c.     $604,435 that represents BLACK's purchase of an antique pearl and diamond bow brooch from S.J. Phillips Ltd. on or about November 21, 2000.

3.     Pursuant to Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p), if any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants, either:

        ■     cannot be located upon the exercise of due diligence;

        ■     has been transferred or sold to, or deposited with, a third party;

        ■     has been placed beyond the jurisdiction of the Court;

■        has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property belonging to the defendants up to the value of the above forfeitable property.

## FORFEITURE ALLEGATION FOUR

The UNITED STATES ATTORNEY further charges:

1.     The United States Attorney realleges and incorporates by reference Count Fifteen of this Indictment as though fully set forth herein. Notice is hereby given, pursuant to Federal Rule of Criminal Procedure 32.2, that the United States will seek forfeiture as part of any sentence imposed in connection with a conviction on Count Fifteen.

2.     Beginning no later than in or about May 1998, and continuing thereafter until in or about August 2002, in the Northern District of Illinois, Eastern Division, and elsewhere,

CONRAD M. BLACK,

defendant herein, did engage in a violation of Title 18, United States Code, Section 1962, thereby subjecting to forfeiture to the United States certain property pursuant to Title 18, United States Code, Section 1963.

3.     Defendant BLACK:

a.     has acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

b.     has interests in, securities of, claims against, and property and contractual rights which afford a source of influence over, the enterprise named and described herein which the defendant established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a)(2);

c.     has property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

4.     The interests of defendant BLACK subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(2)are:

78

a. All of his right, title and interest in stock and all other ownership interests in Conrad Black Capital Corporation, Ravelston and Inc.

5. The interests of defendant BLACK subject to forfeiture to the United States pursuant to Title 18, United States Code, Sections 1963(a)(1) and 1963(a)(3) are:

a. at least $92,000,000, including but not limited to:

1. the $8,558,035 that represents the net proceeds from BLACK's sale of the Second Floor Apartment that was seized by the United States in October 2005, and BLACK's residence at 1930 S. Ocean Boulevard in Palm Beach, Florida, both of which are pledged to secure BLACK's bond in this case;

2. $2,620,746.69 that represents BLACK's purchase of a 26 carat diamond ring from Graff Diamonds Limited purchased on or about November 21, 2000; and

3. $604,435 that represents BLACK's purchase of an antique pearl and diamond bow brooch from S.J. Phillips Ltd. on or about November 21, 2000.

6. Pursuant to Title 18, United States Code, Section 1963(m), if any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant, either:

- cannot be located upon the exercise of due diligence;
- has been transferred or sold to, or deposited with, a third party;
- has been placed beyond the jurisdiction of the Court;
- has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property belonging to the defendant up to the value of the above forfeitable property.

UNITED STATES ATTORNEY